| 7 | 519 |
|---|---|
| 108 | 377 |

## COUCH, ET AL. v. COUCH.

1. A will of personal property will be established, though not written or signed by the testator, or attested by witnesses, if made according to the directions of the deceased, and approved, and not signed from physical debility, or the near approach of death.

2. It is strong evidence of capacity to make a will, that its provisions are suitable, and made in accordance to previous expressed determinations.

Error to the Orphans' Court of Franklin.

APPLICATION, by the defendant in error, for probate of the will of Sarah Couch, which was resisted by the heirs at law. The will is as follows:

State of Alabama—*Franklin County :*

I, Sarah Couch, of said State and county, do, of my last will and testament, will unto my nephew Henry M. Couch, the following property, to wit: one negro girl named Violett, about twelve years of age, and one negro boy named Wiley, about ten years old: also, two cows and three calves, and one bed and furniture, and other household and kitchen furniture,

too tedious to mention, and one wood clock, to have and to hold to himself, his heirs and assigns forever. Nevertheless in testimony whereof, I have hereunto set my hand and seal, this 21st day of June, 1841.

                                                      her
Test :                                      SARAH ⋈ COUCH, [SEAL.]
J. W. MULLINS.                                      mark.

J. W. Mullins, the subscribing witness, being examined, stated in substance, that being sent for to do some writing for the deceased, he went to her house, and found her much enfeebled. That he asked her if she wished him to do some writing, and if she desired to give her property to Henry M. Couch, that she answered yes. That he then went into another room, when she said, never mind—all will be right. That witness went into another room, and consulted with the persons present, and went again to Sarah Couch, and asked her, if she wished him to write her will, and if she wished to give her property to Henry M. Couch? She answered that she did; and witness then stated, that would do, and went into another room, and prepared the writing offered for probate. After it was written he read it to her, at her request, and asked her if it would do ? She said she reckoned it would do. Witness then told her she must sign it, or make her mark to it. That he placed the paper before her, and the pen in her hand, and that with his assistance, she made her mark. She appeared very careless and indifferent to what she was doing. That she was lying on her back, and he does not know whether she turned her face to the instrument or not, when she made her mark. This was about two or three o'clock, P. M. and she died the same day, between seven and and eight o'clock, P. M. The deceased did not call on any one to witness the will, but he attested it voluntarily.

The father of H. M. Couch, died when he was very young, and he lived with the father of the deceased, she being the housekeeper. That after the death of the old man, the deceased and H. M. Couch continued to live together until her death.

R. M. Clarke was the attending physician. He called to see the deceased on the day of her death, between nine and twelve o'clock, and conversed with her ; she talked rationally,

and appeared to be in her proper mind. He saw that she would inevitably die, and declining giving any more medicine, informed her friends that she would probably die by, or during the night. That J. W. Mullins, and H. M. Couch, talked to him about writing a will for the deceased, which he declined to do, alledging his want of skill. That the deceased was very feeble and sick at the time, but there were no indications of any affection of the brain.

Thomas Mullins saw and conversed with her about twelve o'clock, on the day she died; she appeared in her proper senses.

Charity Mullins did not think the deceased was of sound mind. About two days before the will was made, she supposed she saw her father and mother in the yard—heard the deceased say she wanted some writing done, and advised Henry M. Couch to get Mullins to do it. When the will was written, and the pen handed to her to sign it, she either threw it down, or dropped it, and it was by the help of Mullins that she made her mark.

Nancy Mullins testified, that for several days before her death, she appeared sometimes to be of sound mind, and at others not: When her fever rose she appeared somewhat phrenzied, at other times not. On the day before she died, she called H. M. Couch to her bed side, threw her arms about his neck, said she was about to die, and that she wanted him to have every thing she had; she was then in her proper mind.

Jane Barker saw her occasionally during her last illness, and thought she was in her right mind. Saw her the day before she died, and heard her tell H. M. Couch, she wanted him to have all her property. Heard her say on the day she died, that if Dr. Clarke would not give her any medicine, he could write some for her. On being asked by Mrs. Mullins, what kind of writing she wanted, she answered, some writing done like father's. Mrs. M. then told her Clarke was gone, but that William Mullins could do it for her, and she then told H. M. Couch to go, and bring Mullins. On the day she died, heard her tell her negro to be a good boy, and that Henry would treat him well.

Minerva Barker saw her the day before, and the day on which she died, and thinks she was in her right mind. The

day before she died asked witness to bring her a cucumber, and on the day she died, asked witness if she had brought it.

Rachael Yocum heard deceased say, before she was taken sick, that she intended giving all her property to H. M. Couch, assigning as a reason, that he was as near to her as a child. Heard her say, that if the Doctor could do nothing for her, he could do some writing, and when asked what kind of writing, said the same her father had made. Mullins was sent for at her request, and when he asked her what she wanted done with her property, she said she wanted Meredith to have Violet; and upon inquiring what she wanted done with the balance of her property, she said she wanted him to have all she had. Considered that she was of sound mind.

Mary E. Oglesby heard the deceased say, in 1837, and frequently since, that she intended to give all her property to H. M. Couch—that she had raised him, and expected him to live with her, and take care of her declining years.

Elly Martin heard deceased say, H. M. Couch was as near to her, as if he was her own child, and that she intended to give him all her property. One of her sisters present, said, she had as well give the property to her, that Henry would not thank her for it; to which she replied, he will thank me as much as any of you. This took place in the year 1840.

R. A. Martin proved the same facts.

This being all the evidence, and the parties not desiring a jury to pass upon the facts, the Court established the will, and ordered it to be recorded. From this decree this writ is prosecuted, and it is now assigned for error, that the Court erred in establishing the will.

Noое, for the plaintiff in error, insisted, that two witnesses were necessary to establish a will at common law, and referred particularly to the case of Brown v. Moore, 6 Yerger, 272. He also contended, that there was not sufficient proof that the deceased was of disposing mind and memory.

Cooper, contra, contended, that a will of personal property was not void for want of witnesses. He cited 1 S. & P. 30; 4 Ala. Rep. 255; 25 Law Lib. 52; 19 Vesey, 508. He further argued, that the evidence was very satisfactory to show, that the deceased was sane when the will was made.

ORMOND, J.—From the course pursued in this cause, in the Court below, this Court is now to determine, whether, from the facts in evidence, the paper offered for probate, is the last will and testament of Sarah Couch.

To the validity of a will of personal property, it is only necessary that it be made by, or according to the directions of the deceased and be in writing. It is not necessary that it be witnessed, or written, or signed, by the testator; if drawn up according to his directions, and approved by him, it may operate as a valid will. [2 Blackstone Com. 501; 1 Roberts on Wills, 148; Lovelass on Wills, 316, and cases cited.]

The will in this case is written, and was drawn up according to the directions of the testatrix, as is shown by the proof of several witnesses. The disposition which she made of the property, was such as she had repeatedly declared for several years previously, she intended to make, and which she put in execution as soon as she discovered that her recovery was doubtful. On the evening before her death, she told the object of her bounty, that she was about to die, and that she intended to leave him all she had.

On the succeeding day, when the Doctor by declining to give her any more medicine, and from the lamentations of her friends, finding out her true situation, she wished the Doctor to do the writing for her, and finding he had left, or was unwilling, directed another person to be sent for. When he came, she declared her intention, and when the will was written, approved it, and no doubt we think can be entertained, that it was a valid testamentary disposition.

If it were necessary to sustain the will, we should be inclined to think, that the proof establishes, that it was executed by her; but whether she made her mark to the paper, or not, it is equally operative, as a testament of personal property; and it appear that personal property alone, was intended to be given. The cases are numerous, where instructions, or heads for a testament, have been established as a last will, upon proof, that the intention to die testate existed, and the party had been prevented by accident, or surprised by death, from executing it, in a more formal manner. The case of Huntington v. Huntington, 2 Phillimore, 213, decided by Sir John Nichols, is a strong case in point.

Couch, et al. v. Couch.

The testator being taken ill, went to see his solicitor, and dictated to him his will, which the latter wrote down, and read over to him, and which he approved, and directed him to take home and make a fair copy, and bring early the next morning, for him to execute. On the next morning he was suddenly attacked by a fit, and rendered incapable of executing it, and so continued until he died.

This was established as his will, notwithstanding there was then in existence a previously executed written will, attested by three witnesses. The learned judge considered the case as free from all difficulty, or room for doubt. [See also Dickinson v. Dickinson, Ib. 173, and Nichols v. Nichols, Id. 180; Cogbill v. Cogbill, 2 H. & M. 467; Walker v. Walker, 1 Merivale, 503.]

In this case, leaving out of view the execution, or attempt to execute, the instrument, it is certain that the deceased did not intend to die intestate, and that the will was drawn up pursuant to her directions and approved by her; and if by the near approach of death, or by want of physical ability, she was unable to execute it, it is, notwithstanding, valid as a testament.

It is equally as clear from the proof, that she was of disposing mind and memory. One witness speaks of the deceased laboring under a delusion, two days previous to her death, which was probably owing to an exacerbation of fever; be this as it may, it is evident, from the testimony of all the witnesses, that she was generally sane, and especially on the day of her death. The attending physician, whose testimony is much more to be relied on, than that of the ignorant persons around her, testifies expressly to her mental capacity, although greatly debilitated. The will itself being made in conformity to a fixed determination, entertained and expressed for years, is the strongest proof of her capacity. Even in the case of confirmed lunacy, a will drawn up by a lunatic, was held of itself, to afford proof of a lucid interval, from the internal evidence afforded by the fitness of its dispositions, and its being made in conformity with an intention expressed, previous to the insanity. [See the case of Cartwright v. Cartwright, 1 Phillimore, 90, and the cases collected by Stock on *non compos mentis*, 52.]

Upon every view which we have been able to take of the case, we think the paper was correctly admitted to probate, as the last will of the deceased, and the judgment of the Court below is therefere affirmed.