Winney Williamson *vs.* Jas. B. Nabers *et al.*

———

No. 42.—WINNEY WILLIAMSON, propounder, plaintiff in error
*vs.* JAS. B. NABERS *et al.*, caveators, defendants.

[1.] Parol evidence of a testator's previous declarations, is admissable when
offered, not to explain, alter, or contradict the will, but simply to show, as
presumptive evidence of testamentary capacity, long continued expressions
of a purpose to dispose of his property in a particular way. For the same
reason, such evidence of repeated declarations, manifesting a long contin-
ued purpose, is admissible, to rebut the presumption of undue influence.

[2.] The admissions of an executrix, who is a legatee to the extent of a life
interest in the whole of testator's property, and the propounder of the
will, are competent evidence upon the trial of a caveat to that will.

[3.] Where the Court was asked to charge, "That the absence of proof is
evidence that the fact does not exist; and consequently, that if the jury be-
lieve that no testimony has been produced to show that W. was prejudiced
against her older children, the jury cannot believe that any such prejudice
existed;" and the Court declined to give the latter portion of the request
in charge: *Held*, that, though the latter part of the request should have

been given in charge, as submitted; yet, as in effect, the Court did charge the jury, that in the absence of proof, the fact referred to, did not exist for the jury; this was substantially a compliance with the request, and no injury was done by the refusal.

[4.] The Court should not grant a new trial, merely because the verdict is manifestly against the weight of evidence; and never because of this, unless the preponderance is so great as to shock the understanding and moral sense.

Caveat, in Jackson Superior Court.  Tried before Judge JACKSON, August Term, 1853.

On the 18th October, 1849, John Williamson executed a will, by which he bequeathed the bulk of his estate to his wife Winney Williamson, during her life, and at her death to be divided among the six younger of his children; stating in his will, that he had already given to his older children, what he considered an equal share of his property, at the time they received it.  His wife was named sole executrix.

On the 26th afterwards, the testator died, and Mrs. Williamson offered the will for probate.  A caveat was filed by Jas. B. Nabers, a son-in-law of deceased, and other sons-in-law and sons, alleging that testator was not of sound and disposing mind and memory when he executed the will; and also, that undue influence was brought to bear on him, to cause him to execute the same, by his wife, Winney Williamson, and Micajah, one of his sons.  The Court of Ordinary admitted the will to probate, and the caveators appealed to the Superior Court; and, at August Term, 1853, a verdict was rendered, setting aside the will.  The following is an abstract of the testimony:

## EVIDENCE FOR PROPOUNDERS.

THOMAS STAPLER sworn:—Went to deceased's house on 18th Oct. 1849—deceased said he had sent for him to write his will; said it would not be long; he had told his son to get witnesses, Russel Park, Mr. Haney, Jarrel Sharp—Baptist Park came in Haney's place—witness asked him if his wife

should be sent for, he said not; that he intended nothing to leave there till she died; deceased dictated the will, except he suggested to him two executors; thinks the other witness present all the time he wrote the will; deceased was in bed, and the other gentlemen at the fire place at the other end of the room; read over the will after he wrote it, and he said it was exactly as he wanted it; saw him sign; held and guided his hand while signing; signed as a witness in the presence of the other witnesses; deceased signed and they in his; mind as good as he ever knew him; knew him 40 years; from '35 to '49 lived two miles from him; saw no evidence of any control there or any where else; said Jasper and Cranston's lands were worth less than Jackson's and Lesley's, and he wanted them to have $300 apiece; controlled his family; careful, honest, industrious, saving man; said when his wife died, he wanted his property thrown into lots and drawn for; witness interlined it and then read it over to him; said he had given to his older children what he considered at the time they got it, as equal distributions of his then estate, and he intended them to have no more; Mrs. W. came in and told him it was time to take his medicine; he said no, not until I get this business off my hands; witness asked him if he did not intend his younger children to be provided for, in case they married before the old lady's death; he said not a cent, she should have all her life, and then it should be theirs; is positive John Williamson did not forget the name of his eldest daughter; when he came to the name of Winney, he asked him how she spelled her name, thinks he said Winney M., but may have said Winney Ann.

*Cross-examined:* His wife was not in the room; recollects she passed through, and he asked her how Winney spelt her name; he was weak, but said he was perfectly easy; thinks he was assisted to sign his name; when in health he could write his name; recollects no other suggestions he made; don't remember whether the old lady was in the room when he got there or not; had no conversation with the old lady or Micajah; Winney was in another room sick; there was a door between

the rooms, but he is confident Mrs. W. could not have heard him and Mr. W.; read the will over to him; and he said it was exactly as he wanted it.

*Re-examined:* All the children of one mother.

RUSSEL J. PARK sworn :—Signed the paper as a witness; saw deceased sign it and the other witnesses; all in the presence of each other; mind as good as ever saw it; acquainted with him a long time; deceased told him he had sent for him to witness his will; had a conversation with him after the will was executed; an hour or so; and saw no aberration of mind : saw no undue influence of any sort; Micajah was starting to the mill as he, witness, came up; none of the children were present; Baptist Park is dead; he said on the former trial that he signed the will, &c.; that the old man was sound in mind; the deceased had no fever.

*Cross-examined:* Talking about sickness in the neighborhood and neighbors; that the old lady wanted to administer medicine, and he declined to take it, until he had his business disposed of; was well acquainted with the family; Nathan near fifty; worked with his father; John L. too; Eliza Nabers worked about the house, cooked; said he had got his mill nearly completed, and he then expected to give it up to Mike : if he did not, Mike would kick him out; said this in romance.

*Re-examined:* Man of his own head; had his own way, &c.

JARREL SHARP sworn :—Subscribed the paper and saw deceased sign in presence; he knew deceased 15 to 20 years; lived one and one-half miles off 2 or 3 years; was sound in mind; he was sick, but there was no difference in mind; had conversation with him; left about one o'clock; talked about general subjects : a good deal about dying; Mrs. W. wanted to send for Micajah to help her attend to Winney and the negroes, who were sick; would not allow Mike to leave the mill; saw and heard of no undue influence; the partition door was closed most of the time.

*Cross-examined:* Some women came in and went out; thinks he was lying down, but can't say positively; will read; was a firm man and the head of his family.

WM. J. PARK sworn:—Intimately acquainted with testator; lived there at work near five years before he died; saw him once or twice a day every day during his illness; his mind was good as common; one night his mind was wandering; Tuesday night; the will was made Thursday; thought he has his mind as good as he ever knew him; said to him he intended making a will; had a great many children and wanted no fussing, and meant to send for respectable men that knew him well, to witness his will; he intended leaving everything to his wife during her life, so that the children should look up to her; heard him say some of his children had got all they ever would get—mentioned Jackson, Jasper and others; said he had sons and sons-in-law that would divest the women of everything if they could; all this conversation occurred during his health; lived about one-fourth mile off; the old man was a firm, controlling man; not easily controlled; a man of his own head; the old woman and the boys were opposed to building the mill, and he said he would build it if he sold all his negroes to do it.

*Cross-examined:* There were 42 likely negroes he left; had a very good stock of cattle, &c., &c.; don't know how much land; gave to Jackson a negro boy 14 or 15 years old; a horse; hogs, cattle, sheep, &c., &c:; Mrs. Appleby a negro girl, horse, household furniture, &c.; did no work after the will was made.— Mike said his father had given him a tract in Newton; don't know the number of acres; heard Mike say he had sold it.

DR. JOHN D. LONG sworn:—Attended on testator in his last sickness; present with him 17th, 19th 21st, 22d Oct. 1849; saw nothing indicating derangement of mind; had considerable conversation with him; on the night of the 17th, wished to know if the Dr. could prevent him from having a bad spell the next day, as he wanted some writing done; the Dr. replied, he thought he could keep the fever down by administering medicine; his cousin, Dr. C. Long, did administer the medicine; testator wanted him to have his horse put up and stay all night; witness declined.

*Cross-examined:* Dr. C. Long gave quinine that night;

don't remember the quantity; in small doses produces no effect on the head; in large, produces buzzing; has never seen it produce derangement.    On the 19th saw no difference in his mind; if anything better; on the 17th had little fever, not much; the quinine was administered in broken doses.    Testator was an old man, between 50 and 70; had no fever of any account on the 19th; don't think Dr. C. Long was there after 17th and 18th; when he first went in on the 17th, testator called him, in speaking to him, Mr. Nabers.

*Re-examined:* Candle on the table at the other end of the room; quinine will lessen fever when going off; intended it to keep fever down next day.

JOHN SHACKELFORD, sworn:—Was at testator's house some time, a few days before his death; two men came in; Henderson and another came in; had a little conversation; had known him ever since he was a boy; lived a neighbor 30 years or more; appeared to be as much in his mind as ever he had seen him; was sick and feeble in body.

*Cross-exmained:* Knew all his children when he saw them.

*Answers of Wm. Ray, to Interrogatories.*

I was at testator's house during the evening of the 17th Oct. 1849, testator spoke of wanting some writing done, but did not speak of his will.

Testator said he wanted some writing done—that whenever he mentioned it, the boys left the house—that his wife had been a good wife to him—was the mother of sixteen children, and had been almost a mother to the neighborhood, and that he intended to do a good part by her.    He afterwards remarked, that he reckoned George had gone after Russel Park.

Testator did not say or do anything which I considered foolish —he was very sick, appeared to be suffering much, and quite restless: he conversed with me about different matters, his conversation was reasonable.    When he was easy and quiet, he would talk till he became restless, when he would move about and change his position, and when he would become easy again, he would commence conversing again, and was apt to talk of some different or new matter.

From what I saw of testator, and heard him say, I thought his mind and memory sufficient to make a will.

I lived with testator from about the last of July, 1848, to the last of February or first of March, 1849.

From my acquaintance with testator, I should not have thought him likely or easily influenced to do an act which was not in accordance with his will. I thought him a man who thought and acted for himself.

*Answers of Calvin C. Hendricks.*

I heard John Williamson say he was going to build a fine mill, but that he did not expect to be here long to enjoy it, but intend for my wife to realize the benefit of it, and all that I have during her life-time. He had this conversation to me in the fall of the year 1848, as well as I recollect.

I was in company with Mr. Williamson soon after his son Jackson moved where he now lives, and observed to him that he was giving his son Jackson off a pretty smart portion of property, and he answered and said yes, that he was afraid that he was giving him off too much, and more than he would have for the rest of his children. To the best of my recollection, this conversation took place in the year 1847.

I met with Jasper Williamson the morning after his father's death, and asked him how his father was; and he said, that he hoped that he was well and in heaven; and that he died in his right mind, and that he was perfectly in his senses all the time of his sickness.


## TESTIMONY FOR CAVEATORS.

*Interrogatories addressed to Thomas A. Carr.*

1st Intg. Do you know the parties in the above cause?

2d Intg. Say whether or not you were at the house of John Williamson during his last illness? How long was it before his death?

3d Intg. If yea, state what occurred between you and said Williamson at the time, with regard to your doing some writing for him?

4th Intg.  Did any person present object ?

5th Intg.  Who was it ?

6th Intg.  What reason did the  person objecting assign why you should not perform the services Williamson required of you ?

7th Intg.  State the conduct of the person objecting at the time of the request,  and after.   What did he or she do or say ?

8th Intg.  Did you do the writing ?   If not, what was the reason ?

9th Intg.  State particularly all  you  know  that will go to show that Winney Williamson could and did control the said John, in making the pretended will which they are now trying to set up ;  and all you know  in favor of the caveators,  as if particularly thereto interrogated.

### Cross Interrogatories.

1st Intg.  Did you see  testator do  or say anything foolish? What was his appearance ?    Was he not very sick ?    From all you saw and heard him say, did you believe him to  be  in  his senses ?

2d  Intg.  Did he not converse reasonable ?

3d  Intg.  If any objection was made  by  Mrs.  Williamson, did testator hear  it ?

4th Intg.  Did you testify on the former trial anything about her objecting to you doing the writing ?

5th Intg.  Who is present  at the taking of  your  answers to these interrogatories ?

6th. Intg.  State all you know that will benefit the executrix, Mrs. Williamson.

### Answers by *Thomas A. Carr* to Interrogatories.

1st Intg.  He answers, I do.

2d  Intg.  I was at his house five or six days before his death.

3d  Intg.  He asked me  to  write his will :  and said it would not  take me long ;  that everything  that was there, he wanted to remain as long as his wife lived, and at her  death  to go  to his children.

4th Intg.  They did not.

5th Intg.  I do not  know.

6th Intg.  They never said.

7th Intg. I never saw the person.

8th Intg. I did not do the writing, because Mr. Williamson never called on me afterwards.

9th Intg. I know nothing more.

### Answers to Cross Interrogatories.

1st Intg. I did not. He had the appearance of a sick man but seemed to be in his senses.

2d Intg. He did.

3d Intg. She made no objections in my presence.

4th. Intg. I did not.

5th Ing. Sterling Mayes, Wm. A. Mayes, and James M. Smith.

6th Intg. I know nothing more.

### Answers of Wm. Ray.

I resided with testator from July, 1848, up to the last of February or first of March, 1849.

I was there on the 17th of October, 1849.

Mr. Williamson conversed with witness on various subjects— he conversed with his usual reason—was quite restless and complained of suffering much—he stated that he wanted to have some writing done, but it appeared that he could not, for that when he commenced talking about it, the boys left the house ; he said that his wife had been a good wife to him ; that she was the mother of sixteen children, and almost a mother to the neighborhood, and that he intended to do a good part by her—he said (some time after) he expected that George had gone after Russel Parks.

Mr. Williamson conversed with me on various subjects—his course was about this : when easy he would converse until he became restless ; after becoming easy again, he would commence conversing about some new matter—sometimes quitting a conversation, as witness thought, unfinished, and commencing on a different or new matter.

Mr. Williamson spoke of his approaching end—that he did not expect to live, and he was more restless than he was when sick some time before, and his conversation was as is stated in

answer to the fifth interrogatory which I did not notice in his former sickness.

He has frequently heard Mr. Williamson say, that his older boys, when they lived with him, stayed at home and worked, and tried to make something, and his younger boys were disposed to run about and idle their time and spend.

Cranston Williamson helped to frame the mill-house, to dress the frame of the house and the plank—how much or how long he worked, he, witness, does not know.   John L. Williamson helped, himself, with some of his hands, a cart and wagon, in hauling the rock and  building  the foundations of the mill— thinks he helped about one week with his hands, teams, &c.

### Answers of Sarah Millican.

I heard Mrs. Williamson speak of having tried to get her husband to make a will; but I do not think I ever heard her speak of one made by him.   On the night Mr. Williamson died, and while he lay a corpse, Mrs. King and myself were in the room.   Mrs. Williamson came in, and after some time, she and Mrs. King entered into conversation, relative to the deceased—Mrs. King regretting that she had not come in time to see her father while he was in his proper mind.   Mrs. Williamson then remarked, in substance, "Nancy, you would have had no satisfaction with him at any time of his illness, for, on Sunday morning, he was attacked with a violent pain in his head; and in a few hours his mind was flying from one thing to another, and so continued during his sickness.   His sufferings were so severe, and his mind such, that he could not have given you any satisfaction.   His mind was so distracted, that I hardly think think he was ever sensible of his suffering."   After some pause, Mrs. Williamson again went on, saying, "Poor old man, he is gone, and we shall all miss him.   Nancy, I have tried for years, to get your father to make a will, and settle his business, but I never could get him to do it."   There were no other persons in the room except Mrs. Nabers and Winney, (the daughters,) both of whom were lying on beds and asleep.

I have never  personally  witnessed anything myself, which

caused me to think that Mrs. Williamson exercised undue influence over her husband's actions.

### Answers of Winney Ann Williamson.

I did hear a conversation between John Williamson, dec'd, and his wife, upon the subject of the said John Williamson making a will, which was as follows : John Williamson said that he never intended to make a will; that the law had made a will good enough for him; and his wife insisted and urged him to make a will; but he said he never intended to make any difference amongst his children—that wills often caused brothers and sisters to fall out and disagree among themselves—which had been the case of his own brothers and sisters; and that he never intended for that to be the case among his own children; and his wife insisted on him to make a will, and he seemed to get angry, and got up and went off towards the mill.

As near as she can now recollect, it was three years and some three or four months before the death of the said John Williamson.

Mrs. Williamson was the only person she heard, that urged him to make a will in the conversation alluded to, and that the reasons that she urged, was that if he did not make a will, the property would be spent.

He said that wills often caused brothers and sisters to be unfriendly, and the result of fathers' making wills, in nine cases out of ten, the children to become enemies to one another, which had been the case with his own father's children.

He said the law was a good will for him, and that would suit him.

He did say he wished his property to be divided among his children equally—that he never intended to make any difference among his children.

I heard John Williamson say that he never could have his way; that he had told his two sons, Columbus and LaFayette, to go to Athens and get themselves saddles and bridles, and suits of clothes, and that his wife and Micajah objected to it, and

would not let them go, is all that she knows of that will go to benefit caveators.

*Answers of I. A. Few.*

Intg. 1st. He says he knows the parties to the above stated cause.

Intg. 2d. He says he has attempted to trade with John Williamson; that about the 15th November, 1848, he tried to purchase a negro woman and two children from the said John Williamson, who then told him to go to his (Williamson's) wife; that she would sell her to witness; but witness and Mrs. Williamson could not agree on the price for said property, which is the cause of witness not effecting a trade.

Intg. 3d. He answers, that when he went to Williamson to trade for the negroes, he told me to go to his wife; she would sell her to witness; that he (Williamson) had nothing to do with said girl. Williamson then went with him to the house, and after getting dinner he went off, leaving Mrs. Williamson and witness there to make the trade; and further the witness knows nothing.

*Answers to Cross Interrogatories.*

Intg. 1st. He says that John Williamson was willing that his wife should sell me the property, stating at the time that he (Williamson) had no control over said property.

Intg. 2d. He answers that he asked Mrs. Williamson if she would swap the girl; she answered that she would not; but stated that if she parted with the girl she would have the money for her—he then asked her the price, and she answered one thousand dollars cash. He bade her a respectful farewell, and vamoused.

Intg. 3d. He answers that Mrs. Williamson did not use any threats of violence, nor did she use any force; nor did John Williamson appear to be alarmed or in fear of his wife, that was to him perceptible.

Intg. 4th. He answers that he saw nothing that would lead him to suspect any thing but good feeling, good humor, and good terms. This conversation took place at John Williamson's dwelling house.

### Answers of Louisa Arnold.

On one occasion that I recollect, I heard Winney Williamson insist seriously on John Williamson's making a will, but at that time he manifested no disposition to do so ; most that was said by him was said jestingly.   He waived her importunities by telling her she only wished him to make a will and die ; but the will would not make him die any sooner ; and so spoke of it that I thought he was quite indifferent on that subject.   At times when I have heard him speaking more seriously about a will he would frequently remark, the law was as good a will as he could make.

On some occasions I have known Winney Williamson and Micajah both to exercise a stubbornness and self-will in opposition to the requests or expressed wishes of John Williamson —on such occasions he would generally withdraw himself from the contest and submit to have things managed as they might wish.   John Williamson would sometimes want the key to get money out of the chest—his wife would frequently inquire what he wanted with it—would hardly ever give him up the key, but would generally go and use the key herself without letting him into the chest.   Micajah would often differ with him about business of the place.   If the old man wanted a piece of ground planted in one thing, and Micajah in another, Micajah generally carried his point, and the old man would yield—so in other things, he would most generally yield his will to theirs whenever there was any opposition shown by them.

### Answers of Rebecca Shotwell.

I was at Mr. Williamson's about the time, or just before the mill was finished, and, in company with Mrs. Carter, and some others, went down to look at the mill.   While at the mill, Mr. Williamson was talking about it, and said he was not building it for himself, as he did not expect to live to enjoy it long, but for the use of all his children.

On the occasion just alluded to, Mr. Williamson appeared somewhat distressed, and was talking much about the conduct of his family.   Among other things, complained that Columbus was gone, or going off to Texas, contrary to his wishes, and so

far as he knew, without money to take him there.   Said his family disagreed badly, did not manage well; and that the younger boys were not like the older ones.   The older ones worked when they were there ; but the younger ones depended on negroes.   And on her reminding him that he should control his family, and make them do as he pleased, he replied, it is too late now.   They both agree, that from their knowledge of the old man's habits, in transacting business generally, they believe he was to a great extent controlled by his wife and Micajah, and suffered them to have and do things pretty much as they pleased.

EZEKIEL BOGGS sworn:—Was present at testator's, at the time of the execution of the will; shook hands with him; he said he was sick, but not as bad as he had been; then spoke to Stapler, and went to the fire.   Mr. Stapler was writing ; when he came to two of the boys' names, Cranston and Jasper, Stapler said, these you want provision made for.   Testator said yes; Stapler asked how much : Williamson said $300; named then one of the girls, and asked if it was the oldest; testator said he didn't know or couldn't tell ; he went on then to Winney's name and asked how he spelt it; don't know whether the old man spoke in reply; Mrs. Williamson spelt the name ; she passed through the house backwards and forwards from one room to the other ; thinks she was passing through when the question was asked as to spelling the name ; knew testator a good while ; lived a mile and a half from him ; Stapler was sitting on one side of the door ; the door he thinks was between Stapler and the bed.

*Cross-examined* : Mr. Stapler was four or six feet from the bed ; thinks he was as much in his right mind as any man could be who was as sick ; saw nor heard nothing going to show that he was influenced physically or morally to make the will ; man of firmness, and mind strong as ordinary.

WM. HENDERSON sworn :—Was at the house of testator once during his last illness ; it was on Thursday ; thinks it was afternoon ; the old lady, Jasper and Mr. Shackelford were present; she said the doctors had both been there last night; had a few

words with testator just before he left: Milligan, who was talking with him asked how he was; he said sometimes he thought he was going, at others very little the matter and said, 40 years ago Dr. Neisler pronounced him a dead man, and here I am yet.   If he lived to see next March he would be 70; the next thing he recollects of his saying was, he asked who that was talking?   Milligan stated it was Henderson and the old lady; as soon as Milligan mentioned witness name, he stopped talking and had stopped a common pause, and walked to the bed and spoke to him; Milligan said that is Henderson, and repeated over what he had said to Milligan; he then asked him what had become of Ratchford; witness replied and got as far as to say he had gone to Arkansas, and got as far as Memphis, when the testator broke in and asked where witness was going to live next year; did not appear to talk with the same mind that he had known him before; thinks this was about one o'clock; saw nothing of Jarrel Sharp; but saw some one riding off.

*Cross-examined*: He was Administrator of a man by the name of Ratchford; and the old man asked the question about a relative who was the heir; he had sold his place some time before.

*Re-examined*:   Didn't have his common appearance out of his eyes; looked stranger or frightened.

JOHN MILLIGAN sworn :—Was present at the time referred to by Mr. Henderson; heard the conversation between the old lady and Henderson; he was not talking to the old man at the time; thinks he had stopped; he seemed very restless; rolling his eyes about the room; and from his conversation don't think he was in his right mind; remarked so at the time.

*Cross-examined*: Thinks the old man was different from what he usually was; can't say whether he was of sound mind or not; said to Thurmond that he talked reasonably; don't think the old man said any thing foolish or unreasonable; he knew him (witness) and knew what he was talking about.

JOHN McGINNIS sworn :—Heard the old man say a month or two before his death that his children that were about him

never should take advantage of him so as to make him make an unequal will; his father had made such a will; and the old man enquired of witness about it.

*Cross-examination* : This was in Jefferson; thinks it was at August Court; his (witness) father died in '38; he had had law suits about it.

JOHN W. MOON sworn :—Had a conversation with testator on his plantation in 1838 about his disposition of his property; he went by there and asked testator to go with him to the family grave yard; going there he said all this came from your grand-father, and he intended to carry out that will, but he intended to make an equal distribution among his children; said it should be fair among all; he could not have his own way; he was in the habit of making extravagant assertions; he said Mike was a good fellow to work, but would have his way; he said your aunt Winney and cousin Mike have got some, and he would go and see if he could get it for him, but they would not let him have it; said Nathan had received property from his grand-father, and as he would not be able to give his other children as much, he did not intend him to have any more.

*Cross-examined*: Saw him in 1838 and '39 and never saw him till his death; did not see him the last eleven years.

SAM'L G. BARNETT sworn :—Had traded with testator once, sold him land; called on him for the money and couldn't get it; he backed out from the trade and said his family objected; this was in the spring of '46; lived near him 15 years.

*Cross-examined*: Never liked to stand up to a trade no way, unless you had him bound.

CHARLES HARDY sworn:—Lived near old John Williamson; went to buy bacon and he would send him to his wife; the old lady asked him too much; and he didn't buy; said the old lady had some shoats in the pen; testator said the older boys did more hard work than the younger; the younger were too proud; never satisfied unless up to their knees in leather and wrapt up in broad cloth.

JOHN KIRLINE sworn :—Went to mill at testator's some few

months before he died ; he said to him that there were a heap of his children, and intended no noise after his death, but meant to divide his property equally among all his children.

PETER ANGLIN sworn : Worked about testator's mill a good deal in '48 ; Leslie and Jasper and Cranston and the sons about home were at work ; he said Leslie was there at work, he was getting nothing now, but would get something hereafter ; pretty much all the time.

*Cross-examined* : Leslie and witness worked there 18 days.

JOSEPH W. HARDY sworn : Testator was asking about the will of James Weir ; he told him Weir had left all to his wife, to be hers for life, and then divided among his children ; he said he intended to make his about the same way ; this was some ten days before his death.

*Cross-examined* : He was then in good health and mind ; he was a man of firm character ; had some peculiarities.

*Re-examined* : The old set of boys worked hard ; has heard the old man complain of the younger set ; swapped horses once with the old man, and rued back ; he said the family were dissatisfied, and the horse blind, &c. ; the old lady said he had cheated him, &c., &c.

JOHN A. WINN sworn :—Has had dealings with testator ; talked about a negro trade ; he said the negro woman he had proposed trading, was in a deed of trust from his father ; witness then proposed to swap his negro man to him for another negro girl ; Mrs. Williamson asked, why do you want to trade her ? He said he did not care particularly about it, and then the trade stopped.

*Cross-examined* : She, the girl, was then about the house.

ELISHA J. BAYLEY sworn :—Went to testator to buy a cow ; said he would talk to the old lady, and see whether she would let one go ; went and saw him afterwards, and he said the old lady could not let one go. The old lady, next morning at the cow-pen, called him out, and offered him choice of two at her price, and he bought one.

*Cross-examined:* This was in 1849; havn't paid for the cow yet.

ADAM WILLIAMSON sworn:—He was influenced by his wife in this, that when any opposition was expressed by her to his projects he would yield.

WILLIAM R. SEGURS sworn:—Went to buy a negro from testator, and he said the old lady was opposed to the sale and declined selling.

*Cross-examination:* Never went to her at all.

JOHN M. HOLLIDAY sworn:—Heard testator say he intended dividing his property equally among all his children to a dollar, and it made no difference if Nathan had been given by his grand-father; the first conversation was in '32; the second was in 1833 or '34; said in '49 about the same thing; said he was building the mill for all of his children.

JAMES A. THOMAS sworn:—Traded for a note on testator; went to get his money; the old man said to the old lady go and get the money; she refused; he then said give him the keys and he would get it; she said no; he must take it out in trade: this was in 1843; afterwards gave him a five dollar gold piece and said he would pay the balance; 12 or 14 dollars was the amount.

*Cross-Examined:*

JOHN S. ARNOLD sworn:—Was there shortly after the grove was cut down; he asked testator why he had cut it down; he said it was not him, but it was done against his will; 2 or 3 years before he died; in the spring of 1843; he spoke of a water-melon patch at a particular place; afterwards saw it in cotton; testator said Mike would have it in cotton; said he wanted his property equally divided among his children.

*Cross-examined:* He married Louisa King, daughter of Nancy King; Segurs married his sister.

JAMES MILLIGAN sworn:—Heard testator say he wanted to buy his land, but Micajah thought it was too high; and the old lady didn't want to go in debt; this was the fall before he

died; lived one and a half miles from Williamson; heard the old man say his older children worked and dressed in homespun, but his younger were disposed to ride about; his negroes were spoiling his children; said he didn't expect to be here long, and then he hoped the law would do them justice; this was 6 or 7 years ago.

THOMAS P. MOON sworn :—Had a conversation with testator some 12 or 14 years ago at the mill and said he wanted his property equally divided among his children, and didn't want lawyers to reap it; the lands he gave to each of his children worth $500.

*Cross-examined :* Don't know the number of acres, &c. &c.

CHARLES M. HERD sworn :—Heard the old man say that he intended giving an equal share to his children.

ALEXANDER E. BACON sworn :—Heard the testator say he had his older boys to serve him better than the younger; he intended to give an equal share to all.

Dr. CRAWFORD LONG sworn :—Saw testator once, 17th and 18th October, 1849; suffering and laboring under fever for some time ; fever not as high as before he got there ; administered quinine ; intended giving 20 grains during the night and next morning; had some conversation with him; not delirious, but conversation scattering ; did not think him capable of maintaining a regular conversation ; the quinine was given every hour ; quinine has not a uniform effect on the mind; it don't produce a perceptible effect on the mind; it does not produce a greater effect upon weak and sick persons than young and strong ones ; he threw up about 5 grains during the night; his fever usually came on in the evening. Had to inquire of others about his symptoms.

*Cross-examination :* Has the effect of producing roaring on some persons; his mind was better the next morning; said nothing foolish; had less fever next morning ; when he left next morning perspiration was coming on and the fever cooling ; thinks the fever would have entirely left him by evening ; tes-

tator said he was in hopes of getting better (that morning) to have some writing; said he wanted his fever to get better, for he should die he believed if it did not. It had not produced roaring when he left; his mind he thinks would have been better but for the quinine; cannot say there was any positive derangement; mind appeared to be calm next morning when he left, and he was quiet; did not think him capable of conversing connectedly during the time he saw him.

### FOR PROPOUNDERS IN REBUTTAL.

RALPH BAILEY sworn:—Testator said Nathan was pretty well off and he would give him no more; had a good farm and plenty, and didn't want any more. Appleby had joined the masons and he should have no more; was a mason, &c., &c.

JAMES COLLINS sworn:—The testator said to him 3 years before his death that he intended giving his children that had left no more of his property; had given them as much as he could and have any left for me and wife.

JOHN CALLIHAN sworn:—Nabers came to see him, witness, and got the coffin made; and said the testator was in his right mind when he died, and never knew him to be out of it during the sickness; never saw such a case.

*Cross-examined:* His wife was inquiring about his spiritual condition.

WILLIAM WILBURN sworn:—Recollects that Nabers was in the shop and Mrs. Callihan came in and she asked him how he died; Nabers said he was properly at himself to the last.

WILLIAM JARRETT sworn: Heard the old man say in '48 he was afraid he had given his children who had left him more than he would have for the *home* ones.

IRA JARRETT sworn:—Jasper Williamson said he was at himself to the last; Jackson, Cranston, &c., were present; on the day of burial; and none of them denied it.

*Cross-examined:* Testator stated to him frequently, that he intended giving the old lady all the property for her life, and then to the children.

CHARLES HUTSON sworn:—Saw testator the day before he was taken sick, and said honey (his wife) should have *it* (*his property.*)

JOHN B. HARTLEY sworn:—Heard testator say he had fixed off his children with lands, and provisions for the first year; intended his wife to have what he left for life, and that he couldn't do as a good a part by his children with him as the others; he had but a pack of negro property, which might lie down and die.

*Cross-examined:*

JAMES SMITH sworn:—Knew testator 40 years; thinks him a man of firmness.

*Cross-examined:* Never about his house much.

WILLIAM D. SMITH sworn:—Well acquainted with testator; was 20 years his neighbor; he was a firm man in his opinions, and governed his family.

*Cross-examined:* His first children worked hard; can't say as to the younger; the old man and woman lived agreeably and peaceably; ten or twelve years since he moved further off; he has been a great deal about him.

JOHN J. PARK sworn:—Acquainted &c., with testator 40 years; a man of firm and decided character; never knew or saw anything that would indicate he was under the influence of Mike or the old lady.

JEROME MILLER sworn:—Acquainted 40 years, &c., lived close by; a man of nerve and decided character.

*Cross-examined:* Became acquainted with him 15 or 20 years ago.

Counsel for propounders objected to the giving in evidence of the sayings of John Williamson, the deceased, except such as were connected with the making of the will, or shortly preceding the same.

The Court overruled the objection, and admitted the evidence, on the ground that the caveators were allowed to prove all the sayings of the deceased, which would in any way illustrate the issues made by the caveators.

To this decision, counsel for propounders excepted.

Counsel for propounder objected to the depositions of Mrs. Sarah Millican, on the ground that the confessions of Mrs. Williamson were not admissable against the legatees, under the will.

The Court overruled the objections, on the ground that Mrs. Williamson was the sole propounder, and the sole legatee for life.

To this decision, counsel for propounders excepted.

Counsel for propounders requested the Court, among other things, to charge the jury:

That the absence of proof is evidence that the fact does not exist, and consequently, that if the jury believe that no testimony has been produced to show that Mrs. Williamson was prejudiced against her older children, the jury cannot believe that any such prejudice existed.

The Court declined to charge the latter portion of this request, on the ground that it was requesting the Court to charge a fact in the case. To this refusal to charge, propounder excepted.

To the remainder of the Court's charge, no exceptions were taken.

Counsel for propounder moved the Court for a new trial, on the ground that the verdict was contrary to the evidence, and without evidence. The Court refused the motion, and propounders excepted.

Cobb, Thurmond, Underwood, Peeples and Hull, for plaintiff in error.

C. Dougherty, Overby & Millican, for defendants.

*By the Court.*—Starnes, J., delivering the opinion.

[1.] It is alleged first, that the Court below erred in admitting, as evidence, the sayings of the testator, not connected with the making of the will, nor immediately preceding the same.

Parol evidence of testator's intentions, offered for the purpose of explaining, altering or contradicting the will, is inadmissible. But such evidence of testator's previous declarations, when offered, not to explain or alter the will, but simply to prove a long continued purpose, and thus to afford presumptive evidence of testamentary capacity in the last manifestation of that purpose, is proper. If so, of course such evidence is proper, to assail such capacity, or to afford presumption of undue influence. (*Cartwright vs. Cartwright, Phillimore,* 90. *Couch vs. Couch,* 7 *Ala.* 519.)

So far has this been carried, that such evidence has been relied upon, and very properly, too, we think, to sustain the will of an inmate of a mad-house; it being offered for the purpose of showing that the testator wrote the will in a lucid interval, because that it was consistent with a purpose previously expressed, in moments of sanity. (*Bootle vs. Blundel,* 19 *Ves.* 508. *Stock. on Non Compos.* 53.)

The cases cited in the argument, to the effect that the declarations of a testator must be made at or so near the time of the will's execution, as to become a part of the *res gestae,* relate altogether to a different point; and the principle there asserted applies to declarations as to the intentions of testator, or to proof of fraud, or some such matter, and does not conflict with our decision on this point.

[2.] The Court also admitted the depositions of Mrs. Sarah Millican, giving certain statements or declarations of the propounder Mrs. Williamson, as to the state of mind of the testator; and to this, exception is taken.

Mrs. Williamson is executrix, a party to this case, and legatee of the whole estate for life. A conflict of opinion is found in the adjudicated cases on this subject. It has been frequently held that the admissions of a legatee and executor will not be received against the other legatees. And on the other hand, decisions have been made directly to the contrary, and elementary *dicta* are to be found authorizing the reception of such admissions. The point has been already maturely considered by this Court, and perhaps influenced by the strong in-

clination of modern Courts, to carry as many such objections as possible to the credit, rather than to the competency of the witness, it has been held, that the admissions of an executor, a party to the record, and legatee under the will, are competent evidence to go to the jury upon the trial of a caveat to the will. (*Harvey et al. vs. Anderson,* 12 *Ga. Rep.* 69.) We see no reason why this question should not stand, as *res judicata :* especially as in this case, it would seem reasonable that admissions made by one thus circumstanced ; one who was executrix ; who took the whole property for life ; and who was the propounder of the will ; and thus a party to the record, could not have been made against this strong interest, and bias for the purpose of prejudicing the legatees in remainder, or from any other motive than truth.

[3.] Exception is next taken, that when the Court was asked to charge that "the absence of proof is evidence that the fact does not exist, and consequently, that if the jury believe that no testimony has been produced to show that Mrs. Williamson was prejudiced against her older children, the jury cannot believe that any such prejudice existed." The Court refused to give the latter part of the request in charge on the ground, that it was charging a fact in the case.

It is our opinion, that the Court might very properly have given the latter part of the request in charge, and that it was the right of the propounder to ask the charge in this shape. We cannot see that the Court would have been stating or assuming any fact proven, by giving this instruction. Nevertheless, we think that the propounder has not been materially prejudiced by this refusal of the Court ; for the first part of the request which was given in charge is substantially the same thing, and contains the same instruction.. Though the language of the request was not entirely accurate ; though it was not exact to say, that the " absence of proof was evidence that a fact did not exist;" yet the plain meaning was, that in the absence of proof, the fact did not exist for the jury, and this was in substance the same, (and they must so have under-

stood it we think) as if he had given all the instruction which had been requested.

[4.] The refusal of the Court to grant a new trial on the ground, that the verdict was contrary to evidence and against evidence is also assigned as error. We cannot sanction the position taken in the argument, that justice would be subserved if the Court would in all cases set aside a verdict when manifestly against the weight of evidence. It may be true, as eloquently insisted by the Counsel, that it is the high province of the Judge to stand in the breach, and resist the passion and the prejudice which sometimes overcome the jury. But it is also true, that the jury may sometimes stand in the breach, and resist the assaults of oppression and tyranny to which the Judge succumbs. Lessons may be learned from chapters in the history of the Second James, and the Third George of England, full of the struggles and the triumphs of the trial by jury; and fraught with instruction for freemen.

Our Laws have wisely divided responsibility in this respect, by appointing for our judicial system separate spheres in which these two Constitutional bodies shall revolve; and it is the duty of our Courts to avoid all shock from their improper collision. That such collision may be avoided, we have frequently held, and now again repeat, that the Court should not grant a new trial merely because the verdict is against the weight of evidence; and never because of this, unless the preponderance be so great as to shock the understanding, and moral sense.

We have carefully examined the testimony in this case, and have arrived at the conclusion that though this verdict is against the weight of evidence to an extent which causes us to sympathize with the propounder, and to appreciate the strong and energetic appeals of her Counsel, and their earnest conviction that great injustice has been done by it; yet we do not find that the preponderance goes to an extent which will authorize our interference. On the contrary, we find a case for the caveators made by the evidence, of considerable weight; and that our views may by fully understood, we will call attention to some of this evidence.

We have found nothing which really supports the charge of undue influence, and we have not taken that into the account; but the following features of the testimony, we have deemed worthy of consideration :

1. Some fifteen witnesses speak to declarations of the testator at various times, and for many years, manifesting a purpose to divide his property among all his children after the death of his wife ; whilst but little more than half that number give evidence of previous declarations which favor the disposition made by the will.

To a slight extent, this may have been regarded as affording a presumption against his testamentary capacity at the time the will was executed.

2. The principal testimony throwing suspicion on his soundness of mind, is to be found in the statements of witnesses, who were with him in his last moments.

On the 18th day of October, 1849, the will was executed, and on that day, Dr. Crawford Long was in attendance upon the testator ; and says that " he had some conversation with him—he was not delirious, but conversation scattering—did not think him capable of maintaining a regular conversation." If this were so, it is not very surprising, that the jury should have deemed him incapable of going through the regular communication necessary to the due execution of a will.

We will find this idea (presented by Dr. Long,) of the scattering and irregular character of testator's communications, confirmed by other testimony.

John Millican stated that he was present during the last illness of testator, and " He seemed very restless, rolling his eyes about the room, and from his conversation don't think he was in his right mind." He added, " He thinks he was different from what he usually was." He said afterwards, that the old man did not talk foolish or unreasonably. But we see by this witness a confirmation of the restless, unsteady character of mind and body spoken to by Dr. Long.

So too, we find William Ray deposing, that Mr. Williamson conversed with him on the 17th October on various subjects—

"His course was about this, when easy, he would converse until he became restless; after becoming easy he would commence conversing about some new matter, sometimes quitting a conversation, as witness thought unfinished, and commencing on a different or new matter."

And finally, on this point, we find Mrs. Williamson stating, in the hearing of Mrs. Millican, in confirmation of the same idea, that during his sickness, "The mind of the testator was flying from one thing to another."

Now if this be true, and here seems a concentration of testimony on this point, there was in this wandering character of testator's thoughts; this scattering nature of his conversation; this restless and unsteady state of mind and body; a feature of evidence which the jury might not consider as indicative of proper testamentary capacity.   Taken in connection with other facts proven, we think it is no slight testimony.

But decidedly the strongest testimony in support of the verdict, is to be found in the statements of Mrs. Williamson to her daughter.   We have decided that they are testimony; and they show that when that daughter, Mrs. King, was mourning over the dead body of her parent, and grieving that "She had not come in time to see her father while he was in his proper mind," Mrs. Williamson remarked in substance, "Nancy, you would have had no satisfaction with him at any time of his illness; for on Sunday morning he was attacked with a violent pain in his head, and in a few hours his mind was flying from one thing to another, and so continued during his sickness.— His sufferings were so severe, and his mind such that he could not have given you any satisfaction."

If this be credited—if what this lady says, who was thus speaking against her own interests be correct, and this old man during his last illness, from mental infirmity, was incapable of giving to his daughter the satisfaction of his dying blessing, we are constrained to admit that it furnishes a case, which unless there was very strong evidence to the contrary, would justify the setting aside of this last will and testament.

On the whole, our conclusion is, that the preponderance of

testimony in favor of the will is not so great as to authorize our interference with the verdict.

Let the judgment be affirmed.