NEW YORK COUNTY.— HON. D. C. CALVIN, SURROGATE.—
December, 1877—January, 1879.

## LA BAU v. VANDERBILT.

*In the matter of the probate of the last will and testament of* CORNELIUS VANDERBILT, *deceased.*

Unsoundness of mind can only be predicated upon some actual manifestation or development of irrationality.

While the diseased condition of the body, as indicated by an autopsy, may be some evidence to corroborate testimony of actual manifestations of mental alienation, and to account therefor, it should not be received in the absence of some proof of the decedent's irrational conduct.

In any event, the opinion of an expert, of *the probability* of a mental derangement, deduced from an autopsy, would be overcome, as proof of the mental condition of the decedent, by the testimony of one competent observer of the appearance, conversation, conduct and characteristics of the decedent, for a series of years, in his domestic, social, and business relations.

The provisions of the will may be considered in determining the question of the testator's mental capacity; but mere inequality or injustice in the distribution of the testator's bounty among his children, raises no presumption of want of mental capacity or of undue influence or fraud exercised upon him in the execution of his will. Hence, *held,* that a discrimination against a son whose character and course of conduct had displeased the testator for some years — though it may betoken a lack of affection and a sense of justice — is not incompatible with mental soundness.

*Held also,* that a discrimination in favor of a son, as against other children, to whom the testator bequeathed the greater part of his estate, was not of itself proof of mental unsoundness, although the motive in making such a disposition may have been the gratification of an inordinate ambition to perpetuate the success of a particular business enterprise in which he had himself acquired a wide notoriety and a large fortune, by confiding it to the possession and control of a single individual bearing his name.

Where the testator had, from time to time, before the execution of his last will, declared to different persons his testamentary intentions, and had made several wills, all of which were based upon the same general scheme, and such wills, as well as the previous declarations of testamentary purposes, were in harmony with the terms of the last will,

these facts should have great, if not controlling weight in the determination of a question of undue influence and fraud; and especially as against the testimony of witnesses unworthy of credit.

A belief in modern spiritualism, so called, is not evidence of mental unsoundness, unless it appears that the will was the offspring of that delusion.

Declarations of the testator, made two years after the execution of the will, that he was much distressed in mind about his will, and that he feared it was wrong for him to take the advice of his son and his physician (who were charged by the contestant with conspiring to influence the testator unduly), in refusing his daughters access to him,—*Held*, too remote in time to be received as evidence of the testator's mental capacity at the time of the execution of the will.

Upon the cross-examination of a son of the testator, as a witness in behalf of the contestant, the proponent of the will had undertaken to show that the discrimination therein against the witness was justified by his improper conduct. Subsequently, the contestant offered in evidence a letter received by the testator from the son, at or about the time of the execution of the will, which showed that the son had reformed, and to which no answer had been sent. *Held*, that the receipt of the letter was not by itself evidence that the testator knew his son had reformed; that a failure to reply to it did not necessarily imply that the testator accepted the statements of the letter as true, and that, in the absence of other evidence, the letter was inadmissible

In order to make the silence of the recipient of a letter evidence against him, the letter must contain some statement respecting the legal right of the party demanding an answer, or which naturally requires an answer, as where there is some assertion made with respect to the writer's rights; and it must appear that the party addressed was aware of the truth or falsity of the statements contained in the letter.

Declarations of one party to a controversy can not be received to affect the rights of another party, unless such parties are jointly interested so that each party is authorized to speak and act for the others, or unless there is proof of a combination, in which case one conspirator may speak for all his confederates; but in the latter case, a conspirator by his admissions or declarations can affect only his co-conspirators; and if his admissions or declarations cannot but affect other parties, not confederated, such admissions or declarations are not admissible. *Held*, therefore, that the declarations or admissions made after the execution of a will by one of several legatees, who was also the proponent of, and the executor named in, the will, tending to prove undue influence over, and want of testamentary capacity in, the testator, were not competent to prove those facts in a proceeding to set aside the probate, it not appearing that the several legatees were either jointly interested or had conspired.

Although the contestant of probate may show declarations made by the

25

testator after the execution of the will, to show the *effect* of undue influ-
ence upon the mind, he will not be permitted to prove them for the
purpose of showing the *fact* of undue influence where one is shown to
have been attempted to be exercised.

The effect of the restriction imposed by the Revised Statutes (2 R. S., 62,
§ 33), whereby an executor, after the service of a citation issued upon
the filing of allegations against the validity of a will, is directed to sus-
pend all proceedings in relation to the estate of his testator, except the
collection and recovery of moneys and the payment of debts, until a
decision shall be had on such allegations, is such that the Surrogate has
no power, during the pendency of the contest of a will on allegations, to
direct the advance of a portion of a legacy, as provided for in the Re-
vised Statutes (2 R. S., 88, § 82, 83), even though the legatee be also
one of the next-of-kin of the decedent and entitled to a distributive
share of the estate, if the will be set aside.

THE will of Cornelius Vanderbilt, dated January
9th, 1875, and a codicil thereto, dated June 10th,
1875, were duly admitted to probate, and letters
testamentary issued thereon, on the 13th day of
March, 1877.

On the 23d day of May, 1877, Mary A. La Bau, a
daughter of the decedent, filed allegations against the
validity of the will under the statute, by way of
contest, and stated as reasons why the said probate
should be revoked, that the said will and codicil were
not executed according to the statute; that the dece-
dent was not of sound mind and memory, or capable
of making the same, and that their execution was
obtained by undue influence exercised and practised
upon the decedent by William H. Vanderbilt, his son,
and his agents, or servants, and other persons to the
petitioner unknown; that the said will and codicil
were not freely or voluntarily executed, published or
declared as his will or codicil; that the decedent, when
the instruments were executed, by reason of morbid
and mental delusion, mania and mental disorder, loss

or absence of natural affection, and age, was disqualified from making any testamentary disposition of his property, and was thereby more easily subjected to undue influence; and that by reason of a mania, a morbid and unnatural desire to perpetuate his name and power, by concentrating his property in the hands of his son William, and his children, the decedent had become incapacitated from making a valid disposition of his property.

All the parties interested in the estate having been served with citation, the hearing proceeded.

By his alleged will, the testator bequeathed to his daughters respectively, sums varying from $300,000 to $500,000, and gave the sum of $200,000 in trust, the income thereof to be paid to decedent's son, Cornelius J. Vanderbilt, during his life, in such manner as the trustees should deem best for his interest, and provided that no part of it should be paid to any assignee or creditor of Cornelius, and if Cornelius should make any transfer or assignment of his interest therein, or of the interest thereof, or encumber the same, or attempt to do so, the interest should cease, and become payable to decedent's residuary legatee. Other legacies were given of comparatively insignificant amounts, except to his wife, to whom he gave $500,000 in specified securities, with certain furniture, fixtures, and the use of his homestead during her life ; and the residue of his estate, consisting of a very large proportion thereof, he gave to his son William H. Vanderbilt, amounting, as is supposed, to at least nine-tenths of his entire estate. By the codicil, he gave to Cornelius Vanderbilt junior, the son of William H.,

about $5,000,000; to William K., another son of William H., about $2,000,000; to Frederick W., another son of said William H., about $2,000,000; to George, another son of said William H., about $2,000,000; and to his wife about $200,000 additional.

During the trial, a number of questions arose as to the admissibility of testimony, which were decided by the Surrogate in written opinions, herewith presented. A motion was made on the part of the proponent December, 1877, to strike out certain evidence which had been given, tending to show the decedent's belief in clairvoyance, and also evidence of decedent's declarations, showing undue influence exerted by the principal beneficiary under the will.

Other facts appear in the several opinions.

H. L. CLINTON and GEORGE F. COMSTOCK for the proponents.

SULLIVAN TENNEY, SCOTT LORD & ETHAN ALLEN for the contestant.

THE SURROGATE. — The first question is as to striking out testimony respecting clairvoyant belief.

In Gass v. Gass (3 Humph., 278), it was held that no belief as to future rewards and punishments, or the principles of justice upon which they are to be administered, or other religious creed, can be regarded as evidence of insanity, since there is no test by which their truth can be ascertained, so as to determine whether they are delusions or not, and if so, whether they will yield to reason or not. In Woodbury v. Obear (7 Gray, 467), it was held that evidence tending to show that the testator was of feeble mind, and believed in ghosts and supernatural influences, had some tendency to show unsoundness of mind, or that

weakness of mind which would be easily imposed upon by the exertion of undue influence. The case of Thompson *v.* Quimby (2 *Bradf.*, 449; affirmed in 21 *Barb.*, 107), was a much stronger case. Yet the testimony was received. In Robinson *v.* Adams (*Redf.*, *Cases upon Wills*, 367), it was held, that if a testator acts under a delusion, the will, which is the result of a disordered mind, is invalid, and that the jury must determine how far these beliefs were founded in insane delusion, or under undue influence upon the testatrix, under proper instructions as to what constitutes insane delusion and undue influence. In that case, the will was the direct offspring of the testatrix's assumed communication with her deceased husband, and of her belief in regard to her son-in-law being possessed of supernatural control over his wife, and of himself being under the immediate influence and control of evil spirits. Judge Redfield, in a note to the case, does not concur in that view of the law, and defines an insane delusion to be the result of a false perception of the mind, that cannot be cured or dispelled by any amount of evidence or argument addressed to the mind, while in this unsound state; and further, states it to be entirely well settled, upon most unquestionable grounds, that mere speculative opinions upon any religious question, however singular or absurd in the common judgment, will not affect the validity of wills made by such persons. But when a will is unjust and unreasonable to the last degree, and is the direct offspring of a belief which has no existence, in fact, so far as all human testimony goes, it cannot be maintained.

If it is not pretended that the so-called delusion in the belief in clairvoyance had a direct effect upon the provisions of the will in question, it is difficult to understand how the testimony can be held to be material; and yet, in many well-considered cases, such testimony has been received, and been the subject of consideration by courts and juries, in respect to its effect upon testamentary dispositions. Indeed, there seems to have been a general acquiescence in the practice of admitting such testimony, and this seems to be the first occasion when this question has been distinctly raised. Inasmuch as all the authorities place the materiality of such testimony upon whether the will sought to be proved was the direct offspring of the belief, I am of the opinion that some evidence tending to show that fact should first be given, and that until it shall be given, the testimony should be excluded.

The other testimony sought to be stricken out on the motion of the proponent, is as to the declaration of the deceased, made to the witness, that he was much distressed in his mind in reference to his will, and feared that it was wrong for him to take the advice of his son William, and of Dr. Linsley, in having his daughters kept away from him.

In Waterman *v.* Whitney (11 *N. Y.*, 157), so far as it relates to the question under consideration, it was held that the declaration of the deceased, as to how he had disposed of his property in his will, which was in a manner entirely different from the actual disposition of it by the will in question, was competent on the question of mental capacity, which is always involved

where undue influence is alleged; and that such declarations are competent if it is apparent that they have a bearing upon the question of mental capacity. It is put upon the express ground that the mental capacity is at issue when undue influence is alleged.

In that case, this evidence was offered after considerable testimony had been given tending to show the unsoundness of testator's mind, and the court said : "The object of the evidence is to show the mental state of the testator at the time when the will was executed. Of course, therefore, it is admissible only where it has a legitimate bearing upon that question, and of this the court must judge, as in every other case where the relevancy of the testimony is denied. If the judge can see that the evidence offered cannot justly be supposed to reflect any light upon the mental condition of the testator at the time of making the will, he has an undoubted right to exclude it."

In Shailer v. Bumstead (99 *Mass.*, 112,) it was held that declarations of dissatisfaction with the will made at any time after its execution, may be received as tending to rebut any effect the mere continuance of the will in being, with the knowledge of the testator, might have in showing satisfaction with the same on his part, in cases where undue influence is alleged.

In McTaggart v. Thompson, (14 *Penn.*, 149,) the defendant gave evidence tending to prove the insanity of the testator as early as 1803, the deceased having died in 1848, and his being subject, during his life, to morbid violence of temper and consequent melancholy amounting to unsoundness of mind. During the progress of the trial, the defendants offered to prove

declarations of the testator as to the disposition of his property; and that he had ruined his family, and had been deceived and imposed on by persons who had induced him to have his will made.

These declarations were made after the execution of the will; and it was held that such evidence was improperly excluded, because it was competent to show testator's state of mind; and this decision was based upon the case of Rambler *v.* Tryon, (7 *Serg. & R.*, 90). In that case, evidence had been given tending to show that deceased was incapable from defect of understanding to make a will, whereupon evidence was offered of the declaration of the testator, after the execution of the will, that his father-in-law and wife plagued him to go to Lebanon; that they wanted him to give her all, else he would have no rest, and that he did not wish to go to Lebanon. This evidence was admitted, and its admission was sustained by the court, because it was evidence of weakness of mind operated upon by excessive and undue importunity, and there certainly was evidence to show such weakness in the fact that he was lamenting about going to Lebanon, when his going was clearly within his own volition.

I am of the opinion that the declarations of the testator, that he was distressed in his mind in reference to his will, and feared that it was wrong for him to take the advice of his son William, and of Dr. Linsley, in having his daughters kept away from him, made at a time so remote from the execution of the instruments propounded, do not tend to reflect upon the question of the mental capacity of the deceased at the date those instruments were executed.

The motion to strike out granted.

Subsequently (March, 1878), upon the re-direct examination by the contestant of a son of the testator, against whom it was claimed the testator had unjustly discriminated, a letter of the witness to the testator was offered as having been received by the latter at about the time of the execution of the will, which stated that such son had reformed his habits, and to which letter the testator had not replied. The proponents objected on the grounds; *first,* that if the facts stated in the letter were admitted, it could not affect the issue, for the reason that in case the testator should be found to have been of sound and disposing mind, at the time, when he executed the instruments propounded, the fact that his will is what is denominated an undutiful or partial will, did not raise any presumption either against the mental capacity, or mental freedom of the testator; and *second,* that the receipt of the letter by the deceased imposed no obligation upon him to answer, nor justified any inference that he acquiesced in the statements therein contained.

THE SURROGATE.— An amount of testimony has been given by proponents on cross examination of Cornelius J. Vanderbilt, designed to show that his conduct justified the deceased in withholding from him a larger legacy than was bequeathed. If this testimony was material, it would evidently be the right of the contestants to show that the deceased knew, at or about the time when he executed the testamentary instrument, that his son had reformed. It is not

impossible that such testimony may become material in this case, for while the general rule is as stated in the objection, yet if decedent's mind should be shown to have become considerably impaired, if the discrimination which he made against his son could be accounted for by conduct displeasing to his father and justifying a want of confidence, either in his integrity or capacity, it would be a circumstance favorable to the maintenance of the will. Hence the real question to be considered as to the admissibility of the offered testimony, is whether it tended to show a knowledge on the part of the deceased of his son's then reformed conduct, and his acceptance of the statements contained in the letter, as true.

It is true that admissions may be implied from the acquiescence of a party; but to have the effect of an admission, the acquiescence must exhibit some act of the mind, and amount to a voluntary demeanor or conduct of the party, and it must plainly appear that the language was fully understood by the party, before any inference can be drawn from his passiveness or silence. The circumstances too must be not only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply from men similarly situated. (*Greenleaf on Ev.* § 197). The possession of letters and the like are circumstances from which admission by acquiescence may be inferred; but, as stated by Greenleaf, (§ 198, *note*), the possession of unanswered letters seems not to be of itself evidence of acquiescence in their contents, and therefore a notice to produce such letters will not entitle the adverse party

to give evidence of their entire contents, but only of *so much as on other grounds would be admissible.* The same author says, (§ 199), that in regard to admissions inferred from acquiescence in the verbal statements of others, the maxim, *Qui tacet consentire videtur,* is to be applied with careful discrimination. Nothing, it is said, can be more dangerous than this kind of evidence; it should always be received with caution, and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally call for contradiction: *some assertion made to a party with respect to his right,* which by his silence he acquiesces in.

If this kind of evidence be dangerous as to verbal statements addressed to a person, it would seem to be peculiarly so in case of an unanswered letter. In Gaskill *v.* Skene, (14 *Q. B.* 664), a letter was received in evidence written to the defendant, which stated that by an oversight he had been overpaid, and requested him to return the amount, and on appeal it was held that the letter was properly received, being *in substance a demand,* and containing such a statement only as might fairly accompany a demand.

In another case (Vale *v.* Strong, 10 *Vt.,* 457), where the terms of a contract were sought to be proved by a statement to the defendant by way of enquiry of the terms, as stated to witness by the plaintiff, and where the defendant answered "that he never told his trades," this was held inadmissible, the court stating the true rule to be that evidence of this character may be permitted to go the jury whenever the occasion upon which the declaration is made

in the presence of the party, and the attendant circumstances call for serious admission or denial, on his part.

In Corser *v.* Paul (41 *N. H.*, 24), it was held that the silence of a party to whom a note, purporting to be signed by him, was shown with a request to pay, was competent evidence that his signature was genuine, or if not, of his assent to be bound by it. So where before action brought, the plaintiff wrote to the defendant, giving a detailed statement of his version of the facts of the case, and the defendant detained the letters without answer, it was held not admissible as evidence for the plaintiff. (Waring *v.* U. S. Telegraph Co., 44 *How. Pr.*, 69). In Hayslep *v.* Gymer (1 *Adol. & Ell.*, 162), which was an action brought to recover back notes delivered to the defendant by the plaintiff, evidence was admitted that the plaintiff questioned the defendant as to having possession of some property belonging to "W.," of whom he was executor, and that he handed the notes to the defendant, stating that "W." had given them to the plaintiff before his death, whereupon defendant did not deny the statement, but had no means of knowing its truth or falsehood, it was held that the declarations might go to the jury, as evidence in favor of the plaintiff, on the ground, though very slight, of acquiescence in the truth by the defendant, and also as part of the *res gestæ.*

In Draper *v.* Crofts (15 *Mees. & Wels.*, 166), a letter was given in evidence, asking the defendant for the rent of certain premises. The court said : " My opinion is that no attention at all need be paid to a

letter asking for money which the party does not owe. It is a different case if he is bound by circumstances, or by his situation, to return an answer." In Hagenbaugh v. Crabtree (33 *Ill.*, 225), one party to the contract alleged certain things respecting it in the presence of the other party, the other party making no answer. It was held competent evidence to go to the jury, though not conclusive. In Gibney v. Marchay (34 *N. Y.*, 301), evidence of a declaration in the presence of the defendant, was offered, and excluded, the court remarking that the cases in which a party is held to be affected by his silence, will be found to be cases where statements were made of his own actions, or his own liabilities, and not where he had no concern in law, and no right to reply. In Halls v. Thompson (9 *Miss.*, 443), the vendee, in the course of conversation with the vendor about the land sold, charged him with having concealed a deed of trust encumbering the property. The vendor neither admitted or denied the charge. It was held not sufficient evidence of fraudulent concealment to justify the rescission of the contract.

In Fairlie v. Denton (3 *Carr & P.*, 103), Lord Tenterden said: "What is said to a man before his face, he is in some degree called on to contradict, if he does not acquiesce in it; but the not answering a letter is quite different, and it is too much to say, that a man by not answering a letter at all, at all events admits the truth of the statements it contains. I am of opinion this letter cannot be read." In Wright v. Tatham (4 *Bing., N. C.*, 489), a large majority of the judges concurring, it was held, that letters addressed

to a person whose sanity was in issue, were not admissible in evidence, unless connected by proof with some act of his own in regard to the letters themselves, or their contents.

Nothing can be more dangerous than this kind of evidence. It should always be received with caution, and never ought to be received unless the evidence is a direct declaration of that kind which naturally calls for contradiction, — some assertion made to the man with respect to his right, which by his silence he acquiesces in. (Moore *v.* Smith, 14 *Serg. & R.*, 388).

Wharton (Evidence, § 1154), after quoting the language of Lord Tenterden, in Fairlie *v.* Denton (*above*), adds the remark that the rule is otherwise, when the party addressed in any way *invited the sending to him of the letter, or when there is any ground to infer he acted on the letter.*

From the best consideration which I have been able to give to the authorities, I conclude that a wide distinction exists between oral statements made to a party, which remain unanswered, and statements contained in a letter addressed to the party, which is not answered.

In the latter case, to understand the significance of non-answer, it is necessary to be fully possessed of all the circumstances surrounding the receipt of the letter, the recipient's habits as to answering letters, his opportunities to do so, his prior engagements, his liability to forget, or inadvertently neglect an answer.

From these authorities, I deduce the rule that in order to make the silence of the recipient of the letter evidence against him, it must contain some statement

respecting the legal right of the party requiring an answer, or naturally demanding one, and it must appear that the party addressed was aware of the truth or falsity of the statements contained therein.

The evidence in this case, and testimony offered, affords no proof of such circumstances or knowledge on the part of the deceased. For the truth of the statement of the writer of the letter (whom the testator had thought to have forfeited his confidence), the testator had to rely upon the statements themselves. A prudent man would have awaited a diligent inquiry in respect to the facts before making up his mind as to the truth of the statements; and his failure to answer may be considered as more indicative of his continued distrust, rather than a belief in the son's reformation.

As the proof now stands, I am of the opinion that the letter is inadmissible, and should be rejected.

Subsequently (March 1878) the question arose, in the course of the trial, whether the declarations, or admissions of one legatee, tending to show undue influence, or the want of testamentary capacity, were admissible in evidence in behalf of the contestants.

THE SURROGATE.—The apparent irreconcilability of the authorities bearing upon the subject, has caused some embarrassment in deciding the question raised, and will justify a full statement of the cases so far as they are applicable.

* In Beall *v.* Cunningham (1 *B. Mon.*, 399), it was held that the admission of one of several devisees, obviously against his interest, that the decedent had

given him the paper propounded as a form of will, and told him " that it was a mere form, which he might dispose of as he pleased," was admissible.    In Rogers *v.* Rogers (2 *B. Mon.*, 324), in an action contesting the validity of a will the circuit judge had refused to permit proof of conversations in which the principal devisee, stated a desire to own his father's homestead, and of another conversation in which said devisee remarked :    " We have had too much trouble and difficulty in getting this will, to attempt getting another." On the authority of Beall *v.* Cunningham (*above*) the court on appeal held the testimony competent, and also stated the English practice of receiving admissions by one parishioner against the whole parishioners, where the question involved was common to all, as one could not be compelled to testify against himself and associates ; and said the courts of Massachusetts and Pennsylvania had virtually applied the same rule in will cases.    But the decree was affirmed notwithstanding the alleged error, because the appellate court concluded that the party was not injured by the exclusion.    In Fairchild *v.* Bascomb (34  *Vt.*, 398), evidence that a legatee stated to one of his brothers, (one of the contestants of the will) that he did not know that the deceased had made a will, and that about a week after, he stated to another brother the contents of the will, contrary to the fact less favorable to him, was received, it appearing that said legatee was present at the execution of the will, and that he was sole legatee.    In Atkins *v.* Sanger (18 *Mass.*, 192), evidence was admitted of the declaration of one of the executors and a legatee, as to facts which occurred at the time of making the will.

In Phelps v. Hartwell (1 *Mass.*, 71), testimony was offered to prove a declaration of one of the legatees, giving his opinion, that the testator at the time of making his will was not of sound mind. Sedgwick, J., said that if the appellee who made the declaration were solely interested in establishing the will, he should be in favor of admitting the evidence, because he thought, that evidence of opinions formed at the time, might be fairly presumed to be among the best means of informing a party as to the real state of the testator's mind, but as the other appellee was interested in the establishment of the will, it would not be proper to admit the evidence offered. In Davis v. Calvert (5 *Gill & Johns.*, 269), on a bill filed by one of the next of kin against the probate of a will, the plaintiff offered to show that the executor who propounded the will, in a conversation a few days after the death of deceased, declared that though he had promised the deceased to provide for certain children, he did not consider himself bound to do so, because he was convinced that they were not children of the deceased. The evidence was rejected. But this was held error, the court saying: "Calvert being executor and contingent devisee, representing every interest under the will and being also defendent on the record, evidence of any relevant declarations or admissions by him, adverse to the will, and bearing upon the issues, or any of them, ought to have been admitted; the rule being that the admission of a party to the record, is always evidence, though he be but a trustee for another, with certain exceptions not applicable to this case.

In Lewis v. Mason (109 *Mass.*, 169), it was held

that on the question of undue influence, the statement of deceased's children made in his life time to another child, that such child should not stay in the testator's house, and that they had got the testator where they wanted him, was admissible, for the reason that it had some tendency to show a purpose upon the part of the former to keep the testator under their supervision and control, and exclude the other members of the family from any opportunity to interfere. This statement seems to have been made prior to the execution of the will. In Peebles v. Stevens (8 *Rich.*, 198), it was held that where executors and legatees propounded the will for probate, their declarations, as well after as before the execution of the will, might be given in evidence by the next of kin. The court held them competent testimony, because they were from parties to the cause, and might be used by the adverse party, those making them having a joint interest and representing all the rights and interest of the testatrix, and of her legatees. Some members of the court concurring in the result, put their decision principally upon the ground that a confederacy had been shown between the executors, and that the admission of one confederate bound the others. (See also Durant v. Ashmore, 2 *Rich.*, 184). In Harvey v. Anderson (12 *Ga.*, 69), the general rule was stated to be that the declarations of a party to the record, or of one identified in interest with him therein, were, as against such party, admissible in evidence, and that this rule applied to all cases where he had any interest, whether others were joint parties on the same side with him or not, and whatever might be its relative

amount.   In Williamson v. Naburs (14 *Ga.*, 286), where
the admissions of an executrix and legatee of a life
interest, and the proponent of the will, were held
competent evidence on the trial of a caveat to that
will, Starnes, J., said there was a conflict of opinion
in the adjudicated cases on this subject; but held the
case of Harvey v. Anderson (*above*), made the question
*res adjudicata,* and that it was specially in that case
reasonable that admissions by one who was executrix,
who took the whole property for life, and was proponent
of the will could not have been made against this
strong interest and bias, for the purpose of prejudic-
ing the legatees in remainder, or from any other
motive than truth.   So in Brown v. Moore (6 *Yerger*,
272), the declarations of one of several devisees that
the will had been unduly or fraudulently procured to
be made, were held admissible.

In Smith v. Morgan, (2 *Moody & Rob.*, 257), it was
held that the declarations of an assignee, made before
his appointment as such, were competent; but Fenwick
v. Thornton, (*M. & M.*, 51), is cited in Williams on
Executors, as contrary to this doctrine.   "It may be
doubted," says the author, (*p.* 1612), "whether
admissions made by an executor or administrator
before he was clothed with that character are receiva-
ble in evidence against him in an action brought by or
against him, in his representative capacity."

In Clapp v. Fullerton, (34 *N. Y.* 190), the will was
propounded by the principal legatee and contested on
the ground of testator's imbecility or lunacy, and of
undue influence on the part of the proponent — the
proponent and contestant being daughters of the

deceased — it being alleged that the contestant received but an insignificant legacy, because deceased was laboring under the insane delusion that the contestant was illegitimate. It was proved by a declaration of the proponent that this suspicion had its origin in the mind of her father nearly two years before his death, and in the interim between the execution of the instrument propounded and of a prior will. It does not appear at what period this admission of the proponent was made. It also appeared that the proponent after the testator's death, intimated to a witness that her mother had been too intimate with her father's brother. This testimony seems not to have been objected to, nor is the question of its admissibility discussed by the court, which affirmed the decree of the Surrogate. The evidence must have been given by the *contestant* for the purpose of showing the undue influence exercised by the proponent upon the deceased to induce him to cut off her sister, and therefore, though the evidence were improperly admitted by the Surrogate, *its admissibility could not have been considered on an appeal by the party who gave it.*

In Brick *v.* Brick, (66 *N. Y.*, 144), the declarations of deceased's wife, *the sole legatee,* made several years after the execution of the instrument propounded was received, but the language of the opinion of Judge Rapallo, in that case is, "all these declarations were made in 1864, and there is no proof of any attempt prior to the date of the will to interfere with the intercourse between the brothers." Julke *v.* Adam, (1 *Redf.*, 454), was a case where the declarations of

the widow of the deceased, against whom undue influence was charged, were received.  The Surrogate admitted the testimony as tending to prove *an existing intent and disposition*, citing Brush *v.* Holland (3 *Bradf.*, 240).  In that case the contestants sought to introduce proofs of the declarations of the decedent's widow, to show incapacity and the exercise of undue influence, the widow being a legatee and executrix.  The Surrogate excluded the admission as such; but as it had some bearing upon the motives and dispositions of the persons charged with procuring the will, he was unwilling to say that in that view and bearing it was entirely inadmissible.  The declaration in that case by the widow of her intention to control the deceased in the making of his will, was made prior to the execution of the will.  In Horn *v.* Pullman, (10 *Hun.*, 471), probate was contested on the ground of mental incapacity, fraud and undue influence.  The sole beneficiaries were Mr. and Mrs. Pullman, and the Surrogate rejected the admission of Mrs. Pullman, that she thought what property the testator had when he was done with it ought to be willed to her and her husband, and that they were going to have it, too, also evidence that she said that they had got the property, and had it so fixed that if the children of deceased contested the will, they would have to pay their own cost; that they had consulted a physician beforehand to see if he was competent to make a will, and that he was a nice old man and would do anything she asked him to.  This rejection was held error.

In Dan *v.* Brown, (4 *Cow.*, 483), it was held that the admissions of the plaintiff or defendant, will in

general affect none but himself, and not his co-plaintiff or co-defendant unless they are his partners; that in partition by several tenants in common against others, where the plea was *non tenent insimul,* the admissions of one of the plaintiffs that a will was lost could not be received to affect his co-plaintiff, and that the confessions of one tenant in common of lands, is not evidence against his co-tenant.

In Hammon *v.* Huntley, (4 *Cow.,* 493), it was held that confessions by an executor of a debt due from his testator is not admissible as evidence in a suit for a debt against his co-executor to establish the original demand.   (And see James *v.* Hackley, 16 *Johns.,* 273; Whitney *v.* Ferris, 10 *Id.,* 66; Forsyth *v.* Ganson, 5 *Wend.,* 558; Osgood *v.* Manhattan Co., 3 *Cow.,* 612).

In Bovard *v.* Wallace, (4 *Sergt. & Rawle,* 499), which was a feigned issue to try the validity of a will, the defendants offered to prove that one of the devisees had declared that the testator at the time of executing that writing, was incapable of making a will, which evidence was excluded as incompetent and the ruling sustained on appeal.   And in Nussear *v.* Arnold, (13 *S. & R.,* 323) the declarations of the principal devisee that the testator was incapable of making a will were received in evidence; but on appeal the exception taken to the evidence was sustained.

The same rule was followed in Hauberger *v.* Root, (6 *Watts & Serg.,* 431; Dietrich *v.* Dietrich, 4 *Watts,* 167; Boyd *v.* Ebly, 8 *Watts,* 66; Clark *v.* Morrison, 25 *Penn. St.,* 453; Titlow *v.* Titlow, 54 *Id.,* 216; Dotts *v.* Feltzer, 9 *Id.,* 88.)   The rule in Massachusetts is the same, it being held that devisees and legatees have

not that joint interest in the will which will make the admissions of one, though he be a party to the record, admissible against the other legatees. (Shailer *v.* Bumstead, 99 *Mass.*, 112; and in Alabama, Blakey *v.* Blakey, 33 *Ala.*, 611; and in West Virginia, Forney *v.* Ferrell, 4 *West Va.*, 729; and in Ohio, Thompson *v.* Thompson, 13 *Ohio St.*, 356; and in Georgia, Morris *v.* Stokes, 21 *Ga.*, 552.) The reasoning and result of the last case go far towards overruling the earlier Georgia case above referred to—certainly as applicable to the case under consideration.

I think it must be conceded in this case that the will in question must stand or fall in all its provisions, and that there is neither in the proof offered or the allegations filed, on the theory of either of the counsel, any warrant for the suggestion that it may be admitted to probate as to one or more of its provisions, and be rejected as to any of the others. Indeed, I understand this view to have been acquiesced in by all the learned counsel in this case, where the admissibility of proof tending to show undue influence exercised upon the mind of the testator against his son Cornelius J., though not a contestant, was under consideration. For the purposes of the admissibility of the declarations of a legatee, after the execution of the instrument propounded, it must be admitted that they would affect the will as a whole, and the interest of the respective legatees alike.

As the question submitted is one of great importance in this case, and of general interest in probate cases, and has been argued with great earnestness and ability by the learned counsel for the respective

parties, I have deemed it my duty, especially as the authorities directly upon the point are so few in this State, to thoroughly examine each case cited by counsel, and such as my own researches have enabled me to find, together with the elementary treatises upon the subject, as this case in its ultimate result will be likely to settle the question for the future.

It seems to me that the weight of authority is against the admissibility of the declarations of one party to affect the rights of another, unless such parties be jointly interested, by which each party is authorized to speak and act for the whole, or there is proof of a combination, in which case a conspirator may speak for all his confederates. But in the latter case, a conspirator by his admissions or declarations, can only affect his co-conspirators, and if his admissions or declarations cannot but affect other parties not confederated, such admissions and declarations should be excluded. This rule is based upon the most obvious principles of justice. Is there any good reason to be suggested why the rights of one party should be affected by the irresponsible admissions of another party, with whom he chances to be associated as such, but upon whom he has conferred no authority to speak for him ?

Such a principle would enable a party to deprive another of his legal rights, without that other being able either to disprove the admissions, or by cross-examination to test their truth. It is true that the admissions of a party adverse to his interests are held admissible because of the improbability of a person admitting a fact contrary to his interest unless such

admission be true, and there seems to be a propriety in holding such a party bound by his own admissions, but when the interests of another party intervene, that other party has the right to insist that they shall not be divested except by the ordinary proof attested by the sanction of an oath, or by his own voluntary admissions.

In his capacity of executor, the residuary legatee represents with the other executors all the devisees and legatees, and not himself alone, and they have the right in that representative capacity to object to the admissions made by one legatee to affect all the others.

If the testator, the origin and source of the testamentary bounty, cannot, after the execution of his will, admit away the rights of the beneficiaries or impair the validity of the testament by such admissions, upon what principle can one beneficiary be permitted to impair or destroy the rights of his co-beneficiaries, who derive nothing of those rights from or through him ?

Suppose the legatees of the will in question who are neither heirs nor next-of-kin, had declared that they unduly influenced the deceased to make such will in favor of William H. Vanderbilt, can it be that the other legatees are to be deprived of their legacies upon such admissions ? And yet they are parties in interest, represented by the executors. If the doctrine obtain that a party who admits a fact adverse to his interest may affect the rights of all other parties, it would extend the principle to any legatees, however insignificant their legacies. A fact might thus be adjudged which would deprive all the other legatees of their

legacies, upon the irresponsible admission of some, whom they had clothed with no authority to speak for them or to intervene in respect to their rights.    I say irresponsible, because the legatees making the admissions could not be held liable, although their admissions were false.    As to the other parties who had no responsibility respecting the admissions, such admissions would obviously be hearsay.

Suppose a legatee, for some fraudulent or revengeful purpose, or pursuant to some corrupt combination with the contestants, should make admissions adverse to the probate of the will, would it be just that the rights of innocent parties should be thus impaired or destroyed, without the power of redress?

It may be answered that *witnesses,* when examined under oath upon the stand, may swear falsely, and may have entered into fraudulent schemes to destroy the rights of other parties, under the subornation of an adverse party; but in such a case the witnesses would be deterred by the terrors and penalties of the criminal law against perjury, as well as by the admonition of their consciences, and the principal by the penalties of the law against subornation of perjury.    Besides, such witnesses would be confronted by courts, parties and counsel and by public observation, and the aggrieved parties would not only be afforded the opportunity to inquire as to all the circumstances on cross-examination, as a test of the truth of the testimony, showing the manner and conduct of the witnesses for the scrutiny of the court (an almost infallible test of truth), but to impeach the general character of such witnesses for truth and honesty.

Upon well recognized and elementary principles and the highest considerations of justice, as well as the weight of authority, I am convinced that the various admissions and declarations of the executor and legatee offered by the contestant are inadmissible and should be excluded.

In the examination of Harry Allen, called for contestant, he testified that the testator told him, that Mrs. Torrance, one of his daughters, had been saying things that she ought not to have said; that the testator and the witness had been talking of the former's wife, and the witness had excused Mrs. Torrance, and had said that they knew how impulsive she was; that she said things she did not mean; that deceased then assumed a stern manner, which was usual with him when very much in earnest, and answered, "Oh, no! they have all been talking, Billy (meaning the proponent) has told me enough."

Mrs. Le Bau, the contestant, being on the stand, was asked by her counsel whether she had ever said anything to William H. Vanderbilt derogatory to Mrs. Vanderbilt (the second wife of the testator). The question was objected to as irrelevant, and incompetent. Contestant's counsel stated that he offered the evidence to show that the witness had never made any statement derogatory to the testator's wife.

THE SURROGATE.—It is to be observed in the first place that the testimony of Mr. Allen is very vague as to what it was alleged Mrs. Torrance had said, or in respect to whom she said it, and it is equally uncertain

as to what was meant by the deceased, when he said "that they had all been talking," or by the expression, "Billy has told me enough."

It is very difficult to spell out of that testimony an allegation that the contestant had said anything derogatory to deceased's wife, much less that she had said it to W. H. Vanderbilt; but for the purpose of passing upon the admissibility of the testimony, it ought perhaps to be assumed, that the deceased after the execution of the will, charged the witness (Mrs. La Bau), with saying something derogatory to his wife. Assuming that there was the charge, did it tend to show that the charge was true ? If not, then clearly no testimony is admissible to contradict what is not proved; hence we must come to the discussion of the question, whether the declarations of the deceased after the execution of the will are competent for the purpose of proving an attempt by his son William H. to unduly influence him.

[After stating and distinguishing the authorities relied upon by the respective counsel, *pro* and *con*, to wit: Everts *v.* Everts, (62 *Barb.*, 577); Jackson *v.* Kniffen, (2 *Johns.*, 31); Clapp *v.* Fullerton, (34 *N. Y.*, 190); Shailer *v.* Bumstead, (99 *Mass.*, 112); Provis *v.* Reed, (5 *Bing.*, 435); Marston *v.* Roe, (8 *Adol. & Ell.*, 14); Comstock *v.* Hadlyme, (8 *Conn.*, 254); Boylan *v.* Meeker, (4 *Dutcher* [*N. Y.*], 474); Waterman *v.* Whitney, (11 *N. Y.*, 157); 1 *Redfield on Wills*, 545, the Surrogate proceeded as follows:]

The misconception of the decision of the court in Waterman *v.* Whitney (*above*) arises in the supposition

that because undue influence involves the mental condition of the testator, therefore *any* declarations of the testator, after the execution of the will, are admissible, without regard to the question whether or not they, in fact, tend to show the mental state of the testator.

The testimony given by Mr. Allen as to the declarations of the testator under consideration, do not in any sense reflect upon the mental condition of the deceased. If there were proof in this case that such influence was attempted to be exercised, the declarations of the testator tending to show that his mind and will were influenced would be competent.

I cannot concur in the argument of the learned counsel for the contestant, that when testimony is in, it may be considered upon any point in the case, and hence the testimony offered, as to the declarations of the deceased, would be competent as showing the effect which the attempted influence exercised upon him, but it certainly cannot be competent, for any purpose, until the fact of such exercise is proved by competent testimony.

Before testimony can be received to contradict an alleged fact, there should be some evidence tending to prove the fact itself. (Cudney *v.* Cudney, 68 *N. Y.*, 148).

If it be true, as the clear weight of authority seems to establish, that such declarations cannot be received to prove the fact of the undue influence, obviously evidence tending to disprove representations not proved are inadmissible without proof of the fact of undue influence.

If the declaration of a testator after the execution of his will be admissible to show the fact of undue influence, then clearly he might by such declaration completely destroy the will.   But under our statute a revocation of a will can only be affected by the same solemnities, as are necessary for its execution, and by numerous cases it is held that such revocation cannot be shown by the subsequent declaration of the testator.

To use the language of Thompson, J., in Jackson *v.* Kniffen, (*above*).   "If these declarations are not to operate as a revocation, I am at a loss to see in what manner they could effect the will.   To permit wills to be defeated or in any manner whatever impeached by the parol declarations of the testator, appears to me repugnant to the very genius and spirit of our statute, prescribing the only mode of revoking a will, and not to be allowed."

The testimony offered must be rejected.

Pending the controversy on the allegations against the probate, Mary La Bau, the contestant, applied by petition, for an allowance out of the estate, as an advance on account of her distributive share of the estate, in case probate should be revoked, and on account of her legacy in case such probate be confirmed, to the amount of not less than twenty thousand dollars.

THE SURROGATE.— The section of the statue under which this proceeding is taken is section 97, page 106, 3d volume of the Revised Statutes [6th ed.], (2 *R. S.*, 98

§ 82), and reads as follows: " Any person entitled to any legacy or to a distributive share of the estate of a deceased person at any time previous to the expiration of one year from the granting of letters testamentary, or of administration, may apply to the Surrogate, either in person, or by his guardian after giving reasonable notice to the executor or administrator, to be allowed to receive such portion of such legacy, or share, as may be necessary for his support." Section 98, (2 *R. S.*, 93, § 83), provides that " if it appears to the Surrogate that there is at least one-third more of assets in the hands of such executor or administrator than will be sufficient to pay all debts, legacies and claims against the estate, then known, he may, in his discretion, allow such portion of the legacy or distributive share to be advanced, as may be necessary for the support of the person entitled thereto, upon satisfactory bond being executed for the return of such portion with interest whenever required."

The principal question argued by the counsel, in submitting this case, was, whether any such advance could be made before the termination of the pending litigation. On the part of proponent's counsel, it was urged that it could not be determined, whether the petitioner would be entitled to any legacy, or a distributive share of the estate, until the will should be finally probated, while the counsel for the petitioner claimed that it appeared that the petitioner was either entitled to a legacy, or to a distributive share, depending upon the fact whether the probate be ultimately confirmed, or revoked, and that the fact that the will had been once probated, and the executors had quali-

fied, and now had authority to collect and recover moneys, and pay debts, gave the Surrogate power to direct them to make this advance, notwithstanding the litigation against the will, and the suspension of their functions.

A literal construction of section 97, (2 *R. S.*, 98, § 82), would doubtless forbid the granting of an advance on this application, for until this controversy is at an end, it will not be determined whether the petitioner is entitled as a legatee or as distributee, and the possible meaning of the section is, that any person entitled to a legacy in a case of testacy, or a distributive share in a case of intestacy, may apply etc., and the literal construction of section 98, (2 *R. S.*, 98, § 83), would forbid an advance in any case of testacy, where the testator had made full disposition of his property, for there would never be a case where the property would be sufficient to pay all debts, legacies, and claims against the estate as provided, since the legacies after payment of debts and claims would exhaust the property, and there would be no case where there would be one-third more of assets in the hands of the executor than sufficient to discharge all debts and claims, and all legacies, and the only way to make that section applicable to a case of testacy would be for the testator to leave at least one-third of his property unbequeathed.

The object of this statute was doubtless to provide for those legatees who might be in need, against the provisions of section 54, page 98, (2 *R. S.*, 90, § 43), of same statute, enacting that legacies should not be paid until after the expiration of one year from the

time of granting letters testamentary or of administration unless directed by the will to be sooner paid.

I am quite clear in the opinion that if this will had never been admitted to probate, there would be no power in this court to direct an advance under the statute in question, unless a special administrator had been appointed, for the reason that there would be no person authorized to act. For the powers of an executor before probate are limited to the payment of funeral charges, and to such interference with the estate as is necessary for its preservation, and he may not, before he receives his letters dispose of the estate otherwise (3 Revised Statutes, 6th ed., § 17, p. 74 ; 2 R. S., 71, § 16), and it may be doubted whether the Surrogate may direct a collector to make such an advance, as by statute his authority is confined to the collection of the personal estate and securing it, and for that purpose to maintain suits as administrator, and to sell personal property on the order of the Surrogate, which can only be made on notice to all the parties interested who have appeared, though the powers of a collector under the order of the Surrogate are somewhat enlarged in this county by section 10 of chapter 359 of the Laws of 1870. But that section would seem to restrict the Surrogate in authorizing a collector to pay debts, to a period of at least one year after the granting of letters to such collector, and upon the application of the collector or of the creditor, and other proof as to the aggregate amount of the debts, and assets.

By Section 30, 3 Revised Statutes, [6th ed.], page 61, (2 R. S., 62, § 33), it is provided that after the service

27

of the citation issued on allegations filed against a will, the executor shall suspend all proceedings in relation to the estate of the testator, except the collection and recovery of moneys, and the payment of debts, until a decision shall be made on such allegations, and that section would seem to recognize the authority of the executor, pending the second probate, to pay any of the debts of the estate.

But the granting of an advance under the statute in question, is not analogous to the payment of the debts of the estate. While it must be admitted that cases very often arise where the necessity for an advance is quite as urgent before the issuing of letters testamentary, in case of a contest, as afterwards within a year, yet the right to apply is dependent upon the fact that letters testamentary have been granted. It may be reasonably doubted whether under the section providing for the suspension of certain functions of the executors on the filing of allegations, the executors in this case can be regarded as having letters granted to them, according to the spirit of the statute.

But the real question is, as to the authority of the Surrogate under section 30 above cited, (2 *R. S.*, 62, § 33), and it seems to me, that when that section prescribes the effect of such allegations upon the powers of executors, and suspends their functions except in respect to certain specific duties, it includes a restriction upon the Surrogate to direct them to do more than is thereby reserved to them.

If this be not so, then if the contest should continue to a period more than eighteen months after the issu-

ing of letters testamentary, the Surrogate might require the executors not only to pay legacies, but finally to close the estate as though not contested, and the contest would be shorn of all practical benefit, and the estate treated as though the will had been irrevocably proved.

The Surrogate has no power to enlarge the authority of the executors during the pendency of this contest, and the motion must be dismissed.

Ordered accordingly.

The case was finally submitted to the Surrogate, March 4th, 1879. The testimony of the subscribing witnesses to the will and codicil showed execution of the will in due form, as required by statute. The witnesses to the will also testified to their knowledge of, and intimate acquaintance with, the testator, and swore that in their opinion he was of sound mind and memory at the time of the execution of the respective instruments propounded, and appeared to be free from any undue influence. The contestants introduced the testimony of an equal number of witnesses to sustain their allegations of undue influence and want of mental capacity, and a number of witnesses were recalled in reply.

Charles A. Rapallo, one of the subscribing witnesses, being recalled for proponents, testified that he drew several wills and codicils for decedent from and after about the year 1856; that the first he drew was drawn from one furnished to him by the decedent, with a statement of the changes that he desired made; that he drew

and attended to the execution of decedent's will of date of June 9th, 1870, and codicil thereto of date of January 16th, 1871; the second dated 17th May, 1872; the third, the 23d day of April, 1873, and one 4th January, 1874; that he drew said will and codicils under the direction of the decedent, also a will bearing date February 8th, 1869, and a codicil thereto of the same date; another codicil, dated 16th September, 1869, which were drawn under the instructions of the decedent; that he also drew another will, and attended to its execution, dated July 14, 1868, and a codicil thereto of the same date, which was drawn under the instructions of the decedent, and that decedent made some change, either by way of will or codicil, nearly every year after 1856, and that he drew four or five wills prior to the will of 1868 given in evidence; that in the prior wills, until the death of his son George, the residuary legatees were William H. and George, and after George's death, William H. was made sole residuary legatee; that all of the wills drawn by him were substantially alike, except the amounts would be, from time to time, increased; that, at first, he gave Cornelius but $3,000 a year, and that by none of them did the daughters get a larger sum than is given them by the will of 1875 now contested.

The several wills proved by this witness were read in evidence.

HENRY L. CLINTON, GEORGE F. COMSTOCK and JOSEPH H. CHOATE, for the proponents.

SCOTT LORD, JEREMIAH BLACK, and ETHAN ALLEN, for the contestants.

THE SURROGATE — [After reviewing the testimony,

the substance of which appears in the opinions below :]
The testimony in this case may be considered under
the following heads :

*First.* — Evidence tending to show unsoundness or
enfeeblement of decedent's mind at the time of the
execution of the will and codicil, as indicated by his
physical ailments, revealed by the autopsy and the
contestant's expert testimony.

*Second.* — The counter proof by the proponents'
experts.

*Third.* — The alleged impairment of decedent's
mind, as evidenced by his alleged weak and irrational
conversation, repetitions, declarations and conduct,
and so-called monomania for wealth and fame.

*Fourth.* — The testimony tending to show the dece-
dent's uniform rationality, intelligence and coherence
in conversations, in business transactions and general
conduct.

*Fifth.* — The alleged fraud perpetrated by William
H. Vanderbilt upon his father respecting the pre-
tended communications from the spirit of his deceased
wife, as to the terms of his will, in complicity with
with Mr. and Mrs. Stoddard and Mrs. Stone, and the
alleged execution. of the will under the direction of
such supposed spiritual interference.

*Sixth.* — The answer thereto, to be derived from
the improbability .of the story, and the character and
antecedents of the witnesses ; its contradiction by
William H. Vanderbilt, the coherent and methodical
terms of the will, and of several antecedent wills.

*Seventh.* — The alleged undue influence of William
H., practised upon decedent, dominating his will.

*Eighth.* — The prior declarations of decedent as to his testamentary declarations, both against and in harmony with the provisions of the will propounded and the concurring testamentary purpose as evinced in the several antecedents wills executed.

Before entering into the consideration of these questions, some general observations upon the proceeding seem to be necessary, by way of emphasizing the conclusions to be reached and promulgated. This case has excited an extraordinary interest in the public mind, as well as in the profession, not so much because of the magnitude of the pecuniary interests involved, which, however, are such as rarely, if ever, have devolved upon a judicial mind to determine, but because there is a very deep solicitude on the part of all classes to know whether the will of such a man as the decedent was believed to have been, could be successfully assailed; in short, whether any will could be made which would successfully resist the assaults of dissatisfied heirs and next of kin. And the inquiry has been in the minds and hearts of many people, whether anyone could dispose of his estate by will, and feel a confidence that such disposition would be respected and sustained by the courts. In fact, the right to make any testamentary disposition has been felt to be on trial in this proceeding. This solicitude has not been confined to those of large possessions, but has pervaded the thoughts of those of moderate means, and those again who, by years of toil and prudence, have accumulated small savings in the fond hope of providing therewith for the necessities and comforts of infirm and invalid children and parents, as well as of an affectionate and faithful wife.

While I am, and have been, fully aware that neither the amount of the pecuniary interests involved, nor the professional nor popular interest manifested in the progress and result of this proceeding, can have any proper effect upon the ultimate rights of the respective parties, or the conclusion to be reached, yet those considerations may well excite a very watchful and unprejudiced conduct of so great a case, and to an impartial and painstaking consideration of the questions involved therein, to the end that the legal rights of the parties may be so adjudged that the right to an untrammeled testamentary disposition of property may be sacredly preserved, with appropriate legal redress for heirs and next of kin against testamentary incapacity and unlawful influence, or fraud, dominating the mind of the testator; and that when this case shall ripen into a judicial precedent, it may serve to preserve and enforce all such rights.

This proceeding has been extraordinary, not only in the vast amount of the pecuniary interests involved and the very voluminous testimony taken, and the time occupied in its trial, and the distinguished counsel engaged, but in the numerous and hotly-contested questions raised upon the admissibility of evidence, and the exhaustive discussions of counsel, embracing nearly all of the questions of fact and law at issue in the case.

Another feature of this contest which seems to have attracted public attention, and justly excited comment, is the persistent effort of children to uncover to the public gaze the secrets of a parent's domestic and private life; to belittle his intelligence and his virtues;

to distort his providence into meanness; to magnify his eccentricities into dementia; his social foibles into immorality; his business differences into dishonesty and treachery; and to ascribe his diseases to obscene practices.

At the outset of the discussion of the various questions involved, it will be well clearly to define the functions of this Court respecting the probate or rejection of a last will and testament. It is not its province to *make* a testamentary disposition of other people's property, or to *revise* a decedent's will upon the principles of justice or equity, but to pass upon the questions raised by the allegations, whether it was made by a person of sound and disposing mind, uncontrolled by any other dominating mind. Indeed, the statute of this State authorizing such a person to dispose of his property by last will and testament, necessarily involves the right to make discriminations which may seem to be illiberal and unjust: and for a court to assume to intermeddle because of such apparent injustice, would invade the free will of a testator, and practically nullify the statute.

It is the settled law of this State that an unequal, or what is denominated *an undutiful will,* of itself, does not raise a presumption either of the unsoundness of the mind of a testator, or of undue influence or fraud exercised upon it, but that the provisions of the will may be considered in conjunction with evidence of mental unsoundness, or enfeeblement, or undue influence. In Deas *v.* Wandell (3 *N. Y. S. C.* [*T.* & *C.*], 128), it was held that the circumstance that a testatrix's will gave all of her property to persons not

related to her, did not raise an inference of a want of mental capacity, or of undue influence.   In Cudney v. Cudney (68 *N. Y.*, 148), the Court of Appeals fully sustained the doctrine that to invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred.   It is not sufficient to show that a party benefited by a will had the motive and opportunity to exert such influence; there must be evidence that he did exert it, and so control the actions of the testator, either by importunities which he could not resist, or by deception, fraud, or other improper means, that the instrument is not really the will of the testator.   In the language of the opinion, in that case, " The court is not to judge of its justice or the reason for discrimination.   The character of the provisions of a will may be considered in connection with the other evidence, in trying the question of undue influence, but it is not in itself evidence of such influence.   However partial or unjust a testator may seem to have been in his testamentary dispositions, if the instrument propounded is actually his will, effect must be given to it."

The autopsy reveals the fact that the decedent was afflicted with several diseases of a chronic and painful character, which most of the medical experts on both sides agree had a tendency to affect the mind, and which Drs. Vanderweyde and Dixon claim under the facts stated in the autopsy, would *inevitably produce unsoundness* of mind.   But those two witnesses on their cross-examination greatly weakened the force of their testimony, for they expressed the opinion that

the statement of the decedent, *according to the fact,* that he was the railroad king of America, if not of the world, and that his son, William H., would be after him, indicated *insanity;* and that a physician standing at the head of his profession, who should say that he stood at the head, would, in their opinion, be of unsound mind, and that about eighty per cent. of that profession were mentally unsound — testimony which seems to provoke the inquiry whether, as the per centage of mental *unsoundness* is so preponderating over the *sane,* it does not raise such a *presumption* of irrationality in the case of all medical experts, as to require *affirmative proof* to *overcome* that presumption, and whether the testimony of those two experts has *in any degree* overcome it.

Two of the most celebrated, experienced, and capable experts, Doctors Gray and Van Buren, testified that there is nothing in the autopsy to suggest a derangement or enfeeblement of mind, and that an autopsy not including an examination of the brain, in their opinion affords no basis of judgment respecting the mental condition of the patient, especially at a year and a half before his decease.

The statements of the autopsy and the expert deductions from them, have seemed to be of very little significance, because they could never rise higher than a mere *suggestion* of a *probable* enfeeblement of mind; and however strong the proof of that probability, they could never outweigh or overcome the testimony of *one* competent observer of the appearance, conversations, conduct and mental characteristics of the decedent for a series of years, in his domestic,

social and business relations; for if there had existed any mental enfeeblement or unsoundness, such an observer would most certainly have noticed it.   Such proof would seem to be only useful as *corroborating* and *accounting* for actual evidence of mental aberration, but such deductions from remote causes should never be accepted as militating against the actual and well-attested facts.   For unsoundness of mind can only be predicated on some unsound manifestation or development.

The testimony relating to the autopsy was reluctantly received, on the assurance that evidence would be given showing irrationality and mental alienation; but this reversal of the proper order of proof has been shown to be unwise in this case, and should be discountenanced.

The facts which the contestant claims show the decedent's unsoundness of mind, or at least a material mental impairment, independent of the autopsy, and alleged to have been proved, and which have, in a great variety of combinations, formed the basis of the numerous hypothetical questions propounded by her counsel, are as follows: that the decedent was ambitious, excitable, violent and irritable; that his memory failed him; that in former years he believed in, and repeatedly affirmed, the duty of an equal distribution of property among children, afterwards half to his sons and half to his daughters; that after he conceived the idea under which his will was finally executed, his mind still vacillated as to the distribution of the estate, which continued to a few months before he made his will, by which he gave to his daughters

comparatively a trifling portion of his estate, and practically disinherited his only other son; that he made and violated testamentary promises, some of them to lineal descendants; that after he made the will he affirmed that he could not make a different will if he made a hundred; that for years before he made the will he entertained towards his daughters sentiments of pride, esteem and affection, and afterwards, without reason emanating from them, pronounced them worthless; that he affirmed and entertained for his son William H. an opinion that he was unworthy and incompetent, and applied to him opprobrious epithets— drawing a comparison favorable to his younger sons, only one of whom survives; that he selected his son William H. to continue his fame and wealth; that at times he applied to him similar epithets, and at others spoke of him in terms of lavish affection — claiming that, among his children, he was the only source of pride; that he affirmed that the Central Railroad would run itself for years, and that his son William H. had more railroad capacity than he had; that the Central Road was the greatest in the country, and that he was himself a railroad king, and that his son William would be, after him; that he had an absorbing desire for wealth; was inconsistent, credulous, suspicious, and receptive of accusations against others, bold, enterprising, talkative, repetitious and boastful, but reticent and able when engaged in railroad business, vain, ostentatious and ambitious, and contemplated a monument more than one hundred feet higher than any known monument or pyramid; and that he believed he received communications as to

his diseases, business affairs, and the terms of his will, from the dead — making such will in substantial accordance with such communications.

The only proof upon the subject of the decedent's failing memory was, that on several occasions he said that his memory was failing.

In respect to the charge that the decedent affirmed the duty of an equal distribution of property, it is proper to remark that the most of the testimony that is given by the contestant upon that subject, except that of Mrs. Bishop, was given by comparative strangers to the decedent, who called upon him in respect to matters in no way connected with that subject, and who testified that, without any apparent inducement or connection with the subject under consideration, the decedent launched out into a garrulous statement of his opinions and purposes in respect to the distribution of his property. In one case it is attempted to be deduced from the decedent's approbation of his father's will, which disposed of $40,000 equally among his children, which certainly falls very far short of an expression of approbation of a like distribution of such an immense fortune as was disposed of by the will and codicil in question.

The testimony of Mrs. Bishop upon this subject, when taken in connection with her declaration that the decedent expressed an affection, fondness and *preference* for his son Cornelius J., and that she volunteered to become a witness, claiming to be impelled thereto by the desire to prevent the robbing of the *orphans* in this matter, and who so readily condemned legislators for making laws entitling a person to make

such disposition of his own property as seemed to him proper, and characterized judges as unjust who did not violate their official obligations by disregarding such laws; and the eager efforts on the part of the witness to give her testimony in defiance of objections and rulings, together with the fact claimed to have been *established* in this case by contestant's counsel, that the decedent had entertained a life-long, unnatural and unjust prejudice against his son Cornelius, and also the fact that when she, and numerous of the other witnesses, testified that the decedent approved of, and declared his intention to make such equal distribution, he then had a series of wills, all making discriminations quite as conspicuous as those contained in the will and codicil contested — such testimony certainly deserves careful scrutiny, and excites the reasonable apprehension that it may have been fabricated.    As to the fact of such an unequal distribution, sufficient has been said heretofore, based upon the well-considered authorities upon the subject of an alleged undutiful will.

I am not able to appreciate the force of the point sought to be made from the statement of the decedent respecting the will in question, that he could not make a different will if he made a hundred, for it is entirely apparent that the allusion was not to his power to make a different will, but the significance of the remark was that he had made it as discreetly and wisely as he was capable of; in other words, that the scheme of the will commended itself to his deliberate judgment.

The alleged different treatment by the decedent of

his son William H. at different times may well be explained by the fact that when he had tested his capacity in the great business enterprise which had so largely occupied his attention, he proved to be equal to the trust reposed in him as a successful railroad man.

The statement of the decedent that the Central Road was in a condition that it would run itself for many years has no significance, except that he intended to say, and believed, that that enterprise had been so firmly established and its policy so fixed that it needed no extraordinary skill to continue it as a successful enterprise.

It may well be that persons will differ widely as to the propriety of the decedent's ambition to perpetuate the great railroad enterprise to which he had devoted so much of his business, life and energy as a monument to his great business skill and success, and as to the good taste of boasting of it.

But wherein does such ambition indicate unsoundness of mind? It must be quite apparent from the testimony that by his will he adopted the wisest means to secure his long-cherished end; for, in the light of the character, capacity, habits and aims of his son, Cornelius J., as testified to by himself, it is not difficult to perceive how utterly that purpose must have failed had Cornelius J. been made jointly and equal residuary legatee with William H. Nor is it much more difficult to predict what would have become of the decedent's immense fortune and the great public enterprises fostered by it, had the estate been equally divided between the next-of-kin.

If, as the testimony shows, the decedent had the cherished ambition to secure and perpetuate the business success which had absorbed much of his time, care and business skill, and which had brought him a great fortune and personal fame and credit, no one knew better than he the imperative necessity of a single mind and will to direct and control. And who, in the light of all the facts, will presume to say that such an ambition was either unreasonable or unworthy, much less that it was *irrational*, judging from the common level of commercial incentives and hopes?

That the decedent, at the suggestion of a son-in-law, entertained the idea of erecting an unprecedentedly high monument and, after giving it consideration, abandoned it, seems to me to be altogether too speculative and remote to form any safe basis of judgment as to his mental soundness; for, if entertaining such a thought was *unreasonable*, the abandonment of such an unreasonable project can scarcely be ascribed to mental enfeeblement or irrationality.

The only other fact proved by the contestant that seems to deserve special consideration upon this branch of the subject, is the alleged prejudice existing in the mind of the decedent against his son, Cornelius J., and his illiberal treatment of him by his will. It is probable that many wise and just men will believe that the infirmities of Cornelius J. should have influenced his father to a more liberal and kind consideration of his shortcomings and necessities, and to have dictated a more generous provision for him in his will, and that the failure to do so betokened a lack of parental affection and justice. Yet *gross injustice* and *reprehensible*

*cruelty* very often manifest themselves in men who are in all other respects mentally and morally responsible for their conduct. But it cannot be overlooked that in the character and the habits of Cornelius J. there was much which was calculated to displease such a father, and though to an entirely impartial observer they may not seem to have justified the discrimination against him, yet I am of the opinion that it falls far short of proof tending to show unsoundness of mind.

The testimony tending to show the mental soundness of the testator at the times when he executed the will and codicil, the probate of which is sought to be revoked, aside from the numerous acts and sayings of his proved by other witnesses, was given by Dr. Linsley, his family physician for over forty years, and intimate personal friend, who habitually saw and conversed with him upon a variety of family, social, business and current topics; Dr. Eliot, who attended him in his last illness almost constantly; Dr. Bodenhamer, who also attended him a portion of the time, and Rev. Dr. Deems, who for several years had been intimately acquainted with and visited him and frequently conversed with him upon current topics; all witnesses who were called by the contestant, and who show quite clearly that there was no manifestation of mental unsoundness or enfeeblement by the decedent down to within but a few hours of his demise. To this testimony add that of Bishop McTyeire, who knew him from 1870, and was his guest for two or three weeks at a time, and who had full conferences with him in respect to the proposed and final endowment of the Vanderbilt

University; of Dr. Van Buren, who attended the decedent in his last illness; William E. Dodge, who had known him since 1843, and had been associated with him as director in a large corporation; James M. Marvin, who had been acquainted with him since 1835, and saw him almost every summer at Saratoga and elsewhere, and conversed with him freely as to business affairs and the current topics of the day; William C. Wetmore, who made his acquaintance in 1850, and . was associated with him in large railroad transactions; Edwin D. Morgan, who knew him from 1834, and was also associated with him in important business matters; John T. Hoffman, whose acquaintance commenced in 1853, and continued down to his decease; Henry M. Phillips, a lawyer, who had known the decedent for 25 or 30 years intimately, and saw him summers at Saratoga, and conversed with him upon the affairs of his business and current topics; Amasa Stone, whose acquaintance began in 1855, and who was intimately associated with him in the general railroad enterprise of the Lake Shore Road and conversed freely with him in respect to its interests; Abraham D. Gardner, his counsel, and Charles M. Davenport, the associate of Mr. Gardner, who were engaged in his behalf in an important litigation, and conversed freely with him in respect to the facts of the case, embracing a great variety of transactions, and who attended his extended examination as a witness before a commissioner in the litigation, the examination continuing through the months of November and December, *just prior to the execution of the will;* Edwards Pierrepont, whose acquaintance with the decedent began in 1860, and

related principally to professional services rendered for and numerous consultations with the decedent in respect to such litigations; James Tillinghast, the general superintendent of the New York Central Railroad west of Albany, whose acquaintance commenced in 1866, and, as a subordinate of that road, had frequent confidential interviews with the decedent in respect to its affairs; James C. Spencer, his counsel, whose acquaintance began in 1866, and continued for several years as his counsel, and who had many professional consultations with him in respect of litigations entrusted to him, receiving statements of fact, which formed the basis of legal proceedings commenced; and, finally, of Edwin D. Worcester, the secretary of the New York Central and Hudson River Railroad Company, who had intimate and confidential relations with the decedent in respect to very numerous and extensive railroad enterprises, and who detailed with remarkable precision very many interviews had with the decedent, and the particular sayings and conclusions rendered— all testify substantially to the clear, coherent, intelligent conversations and wise and prudent judgment in respect to all business affairs of decedent, and that they observed no substantial change in his mental manifestations down to the period of his last illness.

In passing upon the testimony relating to the mental condition of the testator given by those who knew, saw and conversed with him during life, it is proper and necessary to take into account the relative intelligence and credibility of the two classes of witnesses, and their relative opportunities of judging, and in doing so it is not difficult to determine where the preponderance lies.

The testimony, when carefully· considered, shows that the decedent was a man capable of conceiving and successfully executing great business enterprises, of indomitable perseverance, of imperious will, of strong prejudices, of prompt and wise adaptation of means to a desired end, of clear and coherent mind, ready perceptions, quick and accurate conclusions, with almost intuitive and infallible judgment of men and their motives — in short, of very vigorous mind and strong nature, but lacking the amenities of education and culture and a delicate respect for the opinions of his fellow-men.

The mental capacity requisite to the execution of a will is a sufficient capacity on the part of the' testator to comprehend the condition of his property, and his relations towards the persons who are or might be the objects of his bounty, and the scope and bearing of the provisions of his will. (Delafield v. Parish, 25 N. Y., 9; Van Guysling v. Van Kuren, 35 Id., 70; Tyler v. Gardiner, 35 N. Y., 559; Kinne v. Johnson, 60 Barb., 69.)

In Meeker v. Meeker (75 Ill., 260), it is held that the incapacity of preventing the making of a valid will must be such as prevents the person from understanding the effect and consequences of his acts, prevents him from reasoning correctly and understanding the relation of cause and effect in ordinary business affairs. Mere weakness of mind does not incapacitate, if there be sufficient understanding to satisfy the above requirements.

The next question to be considered is, whether William H. Vanderbilt exercised such an influence

over the decedent, in respect to the will and codicil, as amounted in law to fraud or undue influence. In considering this question, it is proper to give due weight to the so-called testamentary intentions, as declared from time to time to the various witnesses who have testified to them, not because a person of sound mind may not lawfully change his mind respecting the purposed disposition of his property, but because such a change without any apparent cause is a circumstance to be considered in connection with other facts to show fraud or undue influence. It is reasonable, also, to give a greater weight to such declarations as harmonize with the terms of the will, and to those made nearest the time when the will was executed, after which there was no substantial change either in his fortune or in his family.

There is a radical and irreconcilable conflict in the testimony upon the subject. Hence, where the truth lies must be determined upon the relative credibility of the witnesses, the probabilities of the case, and other corroborative facts.

The numerous declarations of the decedent as to his testamentary purposes in harmony with the terms of the will contested, seem to be entitled to greater weight, not only because of the intelligence and candor of the witnesses who testified thereto, but because of such concurrence with the terms of the will and codicil—and almost *conclusively* so, because the series of wills and codicils executed several years before were based upon a similar scheme, except so far as they discriminated more harshly against the dissatisfied next of kin. Indeed, such antecedent

wills, framed as they were in all substantial respects like the one contested, except that the latter is less stringent in its provisions, and bequeathed larger sums to the aggrieved next of kin, seem to establish satisfactorily that the instruments contested express the long-entertained testamentary purpose of the decedent, formed when he was of unquestioned sound mind, and in the enjoyment of his full mental vigor.

This evidence, unlike the oral declarations, which may have been imperfectly heard or apprehended, or possibly materially modified by the lapse of the memory of the witness, is clear and certain, because deliberately and with due legal formality recorded and preserved.

In this connection, it is worthy of note that throughout this proceeding the contestant has sought to establish as a fact, that the decedent for many years entertained a contemptuous opinion of the capacity of his son William H., and that after he was placed in a responsible official position in the railroad corporations mentioned, he never sought or respected his opinion upon important business matters. And yet it is claimed that William H. was able to overmaster and dominate the will and purposes of the decedent in the important act of his life — the disposition of his colossal fortune.

The next and final branch of this question to be considered, is the alleged fraudulent conspiracy to defraud the decedent into making his will as he did, by means of false representations respecting communications from the spirit of his deceased wife, advising that he should make his son William H. his successor,

and give all his property to him, as testified to by Mrs. Stoddard and Mrs. Stone.

The discreditable and fraudulent enterprises in which these two witnesses claimed to have been engaged, their manner of testifying, their disreputable antecedents and associations, together with the intrinsic improbability of their story, throw discredit upon their testimony. That William H. Vanderbilt, unless he had taken leave of his senses, openly in a public street, or park, in the light of day, entered into so risky and infamous a conspiracy, *with utter strangers,* is too incredible for a moment's serious consideration.

Yet this strange story is flatly contradicted by William H. Vanderbilt, is discredited by the terms of the will, which do not conform in several particulars to the pretended advice of the spirit of the decedent's deceased wife, but gave unmistakable evidence of the well considered purpose of an *incarnate* mind. But the series of antecedent wills completely demolish this extraordinary theory, for they indisputably show that the will was framed in furtherance of a well considered plan and purpose, matured long before.

In passing upon the credibility of these witnesses, it should not be forgotten that, in a carefully considered opinion written in the early part of this proceeding, it was held that evidence of the decedent's belief in modern spiritualism was not admissible as tending to show his mental unsoundness, unless it should appear that the will or codicil was the offspring of that delusion; whereupon the contestant's

counsel disclaimed the expectation of giving any proof showing that either was the emanation of any such belief.

But after about a year's prosecution of the contest upon that assumption, a sudden change in the theory of the case was made, and this extraordinary testimony of Mrs. Stoddard and Mrs. Stone was given to challenge the credence of the Court. Such testimony, coming from such sources, cannot be accepted as the basis of judicial action in the determination of the rights of property, or its free transmission.

Having reached the conclusion that this testimony is unworthy of credit, it follows that the large amount of testimony given upon the subject of the decedent's belief in modern spiritualism falls out of the case, for the reasons stated in the opinion given for its rejection in the first instance.

But the idea that such witnesses can be, and have been, procured to jeopardize private rights, obstruct the ways of justice, and endanger its due administration, is well calculated to create grave apprehensions; and I should fall short of my duty if I should neglect to urge upon those directly interested in this matter to pursue and bring the offenders to merited punishment, together with their guilty *suborners*, for it is not to be believed that a mere fondness for an odious notoriety was sufficient to call these witnesses from their obscene associations *unsolicited*.

There is no other evidence of undue influence exercised upon the mind of the decedent by William H. Vanderbilt than that already considered, except what is completely overcome by the mental soundness of

the testator, his characteristic firmness of purpose, his impatience of interference, the circumstances of the execution of the will as testified to by Judge Rapallo, the ignorance of William H. Vanderbilt as to the provisions of the instruments, and, above all, by the concurrence of the will in question with the general scheme of his antecedent testamentary instruments.

The influence or importunity which will avoid a will, must be such as to deprive the testator, at the time, of the free exercise of his will, whereby the instrument becomes the will of another mind rather than that of the testator; and such undue influence must have been exercised in respect to the very act, and the act must be proved, and will not be inferred from opportunity and interest. (Gardiner v. Gardiner, 34 *N. Y.*, 155; Seguine v. Seguine, 4 *Abb. Ct. App.*, Dec., 191; Kinne v. Johnson, 60 *Barb.*, 69; Van Hanswyck v. Wiese, 44 *Id.*, 494; Cudney v. Cudney, above cited.)

I have now considered in order all the substantial issues involved in this proceeding, and the testimony bearing upon them, and I entertain no doubt, upon the most careful consideration of the evidence, that the instruments contested were duly executed in conformity with the requirements of the statute of this State by the decedent, when he was of sound and disposing mind, without the exercise of any undue influence or fraud upon his mind and will.

It would be an unworthy *affectation* to pretend that, in the opinion of the Court, there existed even *prima facie* cause for the revocation of the probate of the instrument when the contestant rested. It is true that

some testimony had been given tending to show enfeeblement of mind, and a different testamentary purpose, and of an executed conspiracy to defraud the decedent respecting the terms of his will. But, in addition to the clear testimony of the subscribing witnesses as to the decedent's mental soundness when the instruments were executed, there was then abundant testimony given by the witnesses called by the contestant — Drs. Linsley, Elliot and Bodenhamer, and Rev. Dr. Deems and Mr. Worcester — showing his unimpaired mental condition down to a very short time before his death. There was also proof of the testamentary purposes and reasons given therefor, in harmony with the terms of the will, but no such testimony was necessary in the absence of substantial proof of undue influence. There was also some testimony tending to show a fraudulent conspiracy; but the alleged guilty complicity of the witnesses, and the unreasonableness of the story, and the character of their antecedents, all render it unworthy of belief, in the absence of corroboration, and when contradicted by the terms of the will itself, showing a well-defined purpose in carrying into it the decedent's prejudices of many years against his son Cornelius, and enforcing his expressed opinion that women were not fitted to have large sums of money — a will characterized by a well-defined plan and purpose, intelligently expressed and logically adapting the appropriate means to the end proposed — that testimony became impossible of belief.

The result of this proceeding in its utter failure to justify the aspersions upon the character of Mrs.

Vanderbilt, shadowed forth in the opening of contestant's counsel, and offered to be proven in the progress of the case, should be a lesson to those who are prone to assail private character and revel in promiscuous defamation *as a means of intimidating parties and coercing compromises.* The tardy apology, after the most diligent and persistent effort to secure witnesses capable of testifying to the charges, while praiseworthy in itself, affords but a sorry and meagre amend for the endurance by a delicate, sensitive, cultivated woman, for two years, of a baseless slander of her private character. It is an occasion of no regret, but of gratification, that so much of prurient and defamatory matter has been kept out of this case, consistently with the rights of all the parties engaged in this unseemly revelation of family secrets.

It may well be doubted whether, in the best and most exemplary families, there do not things occur which a reverent regard for the secrecy, the modesty and sacred character of domestic life would preserve from the public gaze. But when such revelations are sought to be made in violation of the obligations of filial and fraternal duty, it behooves courts to confine such disclosures to the narrowest practicable limits consistent with the legal rights of the litigants.

It will not be easy for the public to discriminate between the testimony received and the facts proven in this proceeding, and the numerous charges made in the opening of the counsel, and the more numerous offers of testimony which have been rejected, and hence there seems to be a propriety in calling attention to that discrimination which will relieve the

memory of the decedent, and some of the persons connected with this extraordinary litigation, from imputations of social, domestic and business delinquencies; for the offer of testimony falls far short of a reasonable presumption that the facts alleged exist.

When the passions which have been excited by this protracted and acrimonious controversy shall have subsided, and a kindlier spirit pervades the minds and hearts of those who initiated this proceeding, and they reverently turn to the record their father has made upon the business annals of his time, and perchance cast their eyes over the record of this proceeding, they will rejoice that it is preserved so clean, in spite of all their efforts to tarnish it.

I am of the opinion that the probate of the will and codicil should in all things be confirmed.

Let a form of decision or decree be presented for settlement and signature, on two days' notice.